**VALLEY CATTLE COMPANY, Limited,**
Plaintiff,

v.

**UNITED STATES of America,**
**Defendant.**

Civ. No. 2267.

United States District Court
D. Hawaii.

July 26, 1966.

John Jubinsky, Stephenson, Ashford & Wriston, Honolulu, Hawaii, for plaintiff.

Herman T. F. Lum, U. S. Atty., Yoshimi Hayashi, Asst. U. S. Atty., Honolulu, Hawaii, for defendant.

### DECISION

PENCE, Chief Judge.

Unless clearly stated otherwise herein, the following are the court's findings of facts and conclusions of law:

At all times pertinent to its claims of injury, the Valley Cattle Company was operating a calf farm and riding stables (known as "Saddle City") on leased property immediately mauka [a] of Bellows Field, a military airport of the defendant United States of America. Coming down from the mountains and converging on defendant's land at a point immediately makai [b] of plaintiff's property are the Waimanalo Stream and Kahawai Stream, as well as certain other drainage ditches. The conjoined waters then flow down to the sea through Bellows Field. The drainage basin as it affects the plaintiff here would resemble a champagne glass vertically sliced in half, with the stem of the glass being the stream bed through Bellows Field, running into the sea, the base of the glass.

On the south and west rim of the glass lie the preciptious Koolau Mountains and these are joined on the northwest and north by the Aneanenui Ridge, likewise steep though not as high.

In the lower end of this natural "bowl", the plaintiff built its calf pens and, having contracted for the sale of dairy heifer calves, set up its calf-raising operation. Plaintiff built its calf pens where it did because the stables and road to the same from the highway were already in place, and the pens were built immediately makai and below the stables. As the pictures and the drain-

a. mauka: toward the mountains    b. makai: toward the sea

age survey clearly indicate, the calf pens were placed in one of the lowest areas of plaintiff's leased property—the ground *between* the pens and the streams' confluence is *higher* than the pen area. Also, an old abandoned railroad right of way immediately makai of the pens is much higher than the pen area, and lying as they were between the right of way on the south and the higher ground on the west and east, the pens were thus in a low pocket. (This railroad right of way, as the maps and pictures indicate, forms a barrier which itself hinders the free flow of surface water from the pen area into the conjoined Waimanalo and Kahawai Streams, and water, which but for the right of way would normally flow from the west, is, instead, pushed north and into the small unnamed drainage stream indicated on the maps as lying north of the pens.) Plaintiff, apparently unknowingly, had a built-in inundation or flooding factor for its calf-raising operation from its very inception. The pen area at its highest point (alongside the stable) was but 9.2 feet above sea level and at its lowest was 6.7 feet above sea level. The stream banks at the confluence were respectively 5.4 feet and 5.8 feet above sea level.

On the mauka end of the "stem" of the glass, and on defendant's property, was a wooden bridge identified as B2. Going downstream between that bridge and the sea were two concrete culverts. C2 and C1, and, almost at the sea, another wooden bridge, B1. Immediately mauka of B2, and running along the "bottom" of the "glass" is a high reach of ground which forces all waters collecting above into the stem at a point immediately above the bridge B2. Bridge B2, as well as culverts C2 and C1, were built by the United States during the construction of Bellows Field, circa 1940–41. Bridge B2, over-reaching the banks, on wooden piles, was some 12 feet above the stream bed, and the stream bed at that point was 2 feet above sea level. The culverts below B2, i. e.,

C2 and C1, are 3 cell, 6′ x 6′ concrete box culverts.

It was the practice of Bellows Field to clean the stream through Bellows of grass and water hyacinths before the onset of the normally heavier winter rains. Not seeing this done, in October 1962, Gibson, president and manager of plaintiff, spoke to Major Merrill, commander of Bellows Field, concerning this. Nothing was done however.

On January 6, 1963, rain in the general area started sometime in the late evening and grew heavier during the night. At 5:45 A.M. on January 7, when Gibson arrived at the stables, the water was already some 3 feet deep in the lower end of the pens and some calves had already drowned. Steps were immediately taken to move all calves still alive out of the inundated area. About 6:30 A.M. Gibson called Major Merrill concerning the high water, and saw Merrill at 8.30 A.M. About 7:30 A.M., Merrill contacted Hickam Air Force Base and Kaneohe Air Force Base for heavy cranes to clean the stream through Bellows and these were at work by that afternoon. The stream beds were filled with water hyacinths and pictures in evidence show water hyacinths blocking free passage of the water through the culverts. At one time during the morning, Bellows Field firemen used pike poles to free the water hyacinths from the culvert cell division walls at the upstream side.

The pictures show heavy masses of water hyacinths in the stream, not only floating on the water but also scooped out and piled up by the military cranes on the culverts after the storm. The heavy vegetation in the stream bed, where it passed through Bellows Field, unquestionably obstructed the flow of water down the stream and through the culverts and was a material and proximate cause of the inundation of the plaintiff's pens on January 7, 1963.

In the three weeks following January 7, the Military Engineers cleaned and dug out the stream from the makai side of bridge B2 to the mouth. They did not dig out any area under the bridge nor did they, during this period, clean out the stream bed mauka of B2. B1 had no effect on any flow.

On the night of March 5–6, 1963, it rained, and on March 6 about 8:00 A.M., the rain began falling heavily in the Waimanalo area. The rain mauka of the plaintiff's pens, according to Gibson, was intense. Although the water started to back up before that time, Gibson was not concerned because of the work which he had seen done by the Military Engineers on the stream below the bridge. About 9:00 A.M., the runoff from the mauka area suddenly flowed over the stables and pen area some 3 to 4 inches deep, and within 30–45 minutes the water was up to the stables. By 10:00 A.M. there was 3 feet of water in the stables. By evening, however, the water had drained off.

This inundation of March 6 killed more calves than in January. Because the plaintiff could not supply calves as demanded under a contract for the same, it lost the contract and was forced out of the calf farming business.

By agreement, the first portion of this trial was limited to determination of the question of liability, the problem of damages being reserved

Plaintiff claims that the inundation of its pens on each occasion was proximately caused (1) by the failure of the United States to fulfill its duty to keep the stream beds free and clear of all vegetation; (2) because the culverts were so negligently designed that they could not take the stream flow which the United States should have anticipated would occur; and (3) that bridge B2 was allowed to get into such a state of disrepair that it blocked the flow of water.

The United States has moved to dismiss on the basis that the evidence shows that the plaintiff's claimed damage arose out of flooding of its property and therefore 33 U.S.C. 702c precludes recovery by the plaintiff. The second paragraph of § 702c provides:

"No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place * * *."

On its face therefore, it would appear that the United States could not possibly be held liable to the plaintiff, under the circumstances related above.

Section 702c, passed in 1928, was part of national flood control legislation aimed toward assisting the states in the development of their water sheds and their interests and rights in water utilization and control. The policy of Congress was declared in § 701a:

"It is recognized that destructive floods upon the rivers of the United States, upsetting orderly processes and causing loss of life and property, including the erosion of lands, and impairing and obstructing navigation, highways, railroads, and other channels of commerce between the States, constitute a menace to national welfare; * * * [that] improvements of rivers and other waterways * * for flood control purposes are in the interest of the general welfare; that the Federal Government should * * participate * * * for flood-control purposes if the benefits to whomsoever they may accrue are in excess of the estimated costs, and if the lives and social security of people are otherwise adversely affected."

Bellows Field was constructed circa 1940 in what was theretofore a combination of sandstone ridges and swamp. At that time, the stream meandered through the swamp. In constructing the airport, the Army Engineers materially straightened out the stream and widened it. The

culverts in question were built across the stream in order to lengthen the runways.

■ At the time the culverts were built, the area mauka of B2 was used by the Waimanalo Plantation for the growing of sugar cane. The stream through Bellows never was and is not now a navigable stream. Any flooding of the area immediately mauka of bridge B2, i. e., what is now the entire "Saddle City" area, at the time the culverts were built, would have but inundated the sugar cane lands. The stream was straightened and the culverts built, not for any flood control purposes but solely for and as part of the construction of the airfield. The court will take judicial notice that the appropriations for the same did not come out of funds appropriated by Congress for flood control purposes. A reading of the Act and the cases interpreting it all show that the negation of liability of the United States contained in § 702c for flood damage was aimed at flooding occurring in areas involved in actual or potential flood control projects within the purview of the policy provisions of § 701–1.

As was said in Clark v. United States, 218 F.2d 446, 452 (9th Cir. 1954):

"The provision of 33 U.S.C.A. § 702c barring liability 'from or by floods or flooded waters' expresses a policy that any federal aid to the local authorities in charge of flood control shall be conditioned upon federal non-liability. To base recovery here on any act or omission of the Engineers in assisting in the fight against this flood would run counter to the policy thus expressed." (Citations omitted.)

The purpose of § 702c was "to prevent the Government from being held liable for the staggering amount of damage caused by natural floods, merely because the Government had embarked upon a vast program of flood control in an effort to alleviate the effect of the floods. Because floods could not be eliminated in a single year, flood damage was bound to recur, and Congress did not want to burden its efforts to lessen the total effect of the floods with the cost of the damage that was certain to result in spite of its efforts. In rejecting a proposal to reverse this Congressional policy by indemnifying victims of flood damage, the House Committee on Appropriations said:

" 'The Committee believes that the approval of the proposed indemnification program would commit the Federal Government to a new concept of Federal responsibility which would result in an almost unlimited number of claims from victims of every 'Act of God' disaster throughout the country regardless of the type or size of the disaster. The financial implications inherent in such an action would be enormous.' H.Rept. 1092 on H.J.Res. 341, 82d Con., 1st Sess., p. 5.

"Thus the purpose of the enactment in question was to avoid financial liability being placed on the Federal Government for 'Act of God' disasters, because of the enormous damage which results—often running into the hundreds of millions of dollars. It seems plain that Congress did not intend to disclaim Federal liability for water damage of every conceivable kind, but rather to exempt the Government from liability for damage resulting only from events that could properly be described as floods." Atkinson Co. v. Merrit, Chapman, & Scott Corp., 126 F.Supp. 406, 408–409, N.D. Cal.1954.

Likewise, Stover v. United States, 204 F.Supp. 477, 485 (N.D.Cal.1962) held:

"4. Title 33 U.S.C.A. § 702c applies to all floods and flood waters which result *in whole or in part* from unusual or extraordinary climatic conditions, that is, from climatic conditions which are so severe that a reasonably prudent man using ordinary care would expect a flood to occur as a result of such conditions.

"5. The term 'man-made flood' means a flood (as previously defined)

which is created *solely* by the construction or fabrication of a barrier which impounds a substantial quantity of water which, but for the barrier, would not have been impounded.

"6. Title 33 U.S.C.A. § 702c does not apply to 'man-made floods' which result *solely* from negligent acts."

(All italicized in original.)

It thus appears that if the inundation or "flooding" of plaintiff's pens was not *ipso facto* the result of climatic or "storm" conditions, but was rather caused by the negligent acts of government agents at an operational level, then § 702c has no application and plaintiff may properly urge recovery under the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680.

The practice of the Government, prior to 1961–62, annually to clean out the vegetation growing in the stream manifests that the Government recognized the danger to the upstream lands inherent in allowing the hyacinths and other vegetative growth to clog the stream flow.[1] The evidence shows that it was not so cleaned out before the January 7, 1963 flood only because Bellows Field did not have the necessary equipment, and although Major Merrill had requested the same of them, neither Hickam nor Kaneohe Air Bases had the equipment readily available for use by Bellows during the fall of 1962. This was at an operational level.

Saul Price, regional climatologist of the U. S. Weather Bureau, explained that rains were characterized as annual storms, 2-year storms, 5-year storms, 10-year storms, 25-year storms, etc., based upon the number of inches of rain falling per minute averaged over certain extended periods of time. The two rain gauges in the Waimanalo area in operation in January and March of 1963 (stations No. 794 and No. 795.1) were operating on 24-hour readings. The precipitation for the January 6–7 24-hour period, recorded at these stations was 6.20 inches and 5.26 inches, respectively. The exact amount of rainfall *per minute* could not be accurately determined, therefore, even at the stations themselves. As Price wrote, "in the Waimanalo area the two-year 24-hour rainfall is about five inches."

As is indicated from the charts, Price's letter, and Price's testimony, there can be no fine, precise line of demarcation between a 2-year, 5-year, etc., storm unless the rain gauge from which the data is taken is furnishing minute by minute data. It was also clear from the evidence—even if the court could not take judicial notice of the same—that rainfall on Oahu does not necessarily fall "mainly on the plain." Torrential rains, in very localized spots, commonly called cloud bursts, can and do often occur in and over very narrow areas. This is certainly true along the Koolau Ridge, and the two Waimanalo stations are not located immediately alongside that ridge. The evidence indicated that the major portion of the rain which fell in the area here relevant, probably fell within a 12-hour or less period, but there is no evidence as to how much fell per minute at any time during that period.

From the charts and other exhibits in evidence, and Price's testimony, it would appear that the January 7 rain could reasonably be characterized as representing, and was, about a "two-year storm."

Department of the Army, Corps of Engineers, Drainage & Erosion Control manuals show that the United States engineering specifications for surface drainage facilities for military air fields are "based on a two-year designed storm frequency, unless exceptional circum-

1. Thomas Beveridge, a former manager of Waimanalo Sugar Company and a resident in the area since 1924, stated that in 1940 the cane fields in what is now the Saddle City area flooded during a heavy rainstorm because the stream as it passed through Bellows was partly blocked, and the Government settled with the plantation's claim for the resultant damage.

stances require greater protection." The culverts C1 and C2 at Bellows were so designed. At the time of their installation, the entire area now involved in plaintiff's calf farming operation was used solely for the raising of sugar cane. There were thus no "exceptional circumstances" at the time of the construction of the culverts which would appear to demand any larger drainage facilities than those constructed. As above noted, from the time of their construction about 1940 until January 7, 1963, the only complaint of "flooding" occurred from a blockage of the stream by the Government. (See Note 1, supra.)

■ During the instant storm even with the stream bed and culverts clogged and partially blocked by the heavy vegetation, the stream at its highest rose to and flowed but one or two inches over the top of the culverts. Thus, while the Government's drainage *design* was adequate to take care of the rain which fell during the January 7 storm, as indicated it was unable to do so because of the Government's failure to clean out the stream as was customary, reasonable and necessary if the airport drainage criteria was to be met. The responsibility for the backing up of the water, therefore, rested solely upon the Government for its failure to keep the stream bed clear of the noxious vegetation, and this then was the proximate cause of the inundation of the plaintiff's calf pens on January 7, 1963.

As indicated, the flooding of the plaintiff's calf pens on January 7 which took place resulted solely from the negligent acts of the defendant and not from any unusual or extraordinary climatic conditions. This inundation of plaintiff's pens which took place on this day would not have been expected to occur from the intensity and amount of rain which fell.[2] The court finds the defendant liable for damages proximately caused by the January 7 inundation of the plaintiff's calf pens.[3]

The March 6, 1963 inundation is a different colored horse. Between January 7 and March 6, the entire stream bed from B2 to the sea had been cleaned out. Rain gauge No. 794 showed but 1.49 inches fell on the March 6–7 24-hour period and rain gauge No. 795.1 showed but 2.65 inches during that same period. These figures would indicate that *at the gauges* the rainfall was equivalent to about "an annual storm" and, if that had been all the rain falling in the watershed on that morning of March 6, the stream bed and culverts through Bellows would have easily handled it.

■ Such rainfall as was so registered was entirely incompatible with the facts as shown by the testimony of Gibson, as well as that of Ronald Pulfry, hydraulic engineer for the U. S. Corps of Engineers. Gibson described the rain in the mauka area, i. e., up near the Koolau Ridge, as intense. The water had apparently filled into the "pens pocket" slowly, until suddenly there came a drainoff from the mauka area about 3 to 4 inches deep, a flow so intense that within one hour the water was 3 feet deep in the stables, i. e., 3 feet higher than it had been on January 7, 1963! About this time, the water in the stream through Bellows was running about 18 inches deep over the culvert tops.

From the above, as well as the other evidence, the court agrees with Pulfrey's

---

2. The rainfall records of the two gauges show that in the months of November and December, 1962, the rainfall in the area was light and for the 12-day period immediately preceding the January 6–7 rain only .19 inch of rain fell in the area. Thus the absorption rate of the earth, at the time of the January 7 rain, would have been very high. (Cf., testimony of Walter Matsuyama, civil engineer for the United States at Hickam Air Force Base.)

3. Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955); Rayonier Inc. v. United States, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957); United States v. Hunsucker, 314 F.2d 98 (9th Cir. 1962).

conclusion that somewhere in the upper watershed area, there was rainfall equivalent to a "30-year storm" being dumped into the "champagne glass".

[5] As indicated above, the calf pens were located in a natural low pocket. The plaintiff had given to this area a use which the defendant would never, nor reasonably should, have contemplated when the culverts were constructed. Here on March 6 was no "man-made flood." The construction of the culverts was not the cause of the flooding of plaintiff's pens nor did the bridge B2 have any effect upon this (or the January 7) inundation of plaintiff's property. Although the surface of the bridge was in bad repair both before and after the above dates, the court finds that the span of the bridge was so broad, and its height above the stream level so high and the stream bed and banks under the bridge so clean, that there was no blockage of the water flowing under it.[4] Likewise, although the stream above the bridge had not been completely cleaned out by March 6, no part of the flooding of plaintiff's pens on March 6 was caused in any way by that fact. Rather, the flood waters resulted from unusual and extraordinary climatic conditions.

Nevertheless, plaintiff claims the Government was negligent and therefore liable in damages in having built culverts capable of handling only the waters of "two-year storms", when the U. S. Engineers possessed knowledge that storms of much greater magnitude are "not so unusual or so extraordinary that they could not have been forseen." Plaintiff urges that it is entitled to recover under the holdings of Cabral v. City and County of Honolulu, 32 Haw. 872 (1933) and F. Koehnen, Ltd. v. Hawaii County, 47 Haw. 329, 388 P.2d 214 (1963), viz., where the defendant constructs a culvert in a drain way which is "inadequate to carry waters from storms which are not so unusual or extraordinary that they could not have been forseen", the defendant is liable for the damage caused by such obstructive culvert. In *Cabral*, the homes damaged by the flooding stream were already in place at the time the culvert was constructed by the defendant and thereafter the defendant also diverted new flood waters into the stream. Thus, factually the *Cabral* case is far from applicable here.[5]

There exists a vital difference, however, between the legal problems presented here and that presented in the two Hawaii cases. Under the Federal Tort Claims Act the United States relinquished its sovereign immunity only to the limited extent set forth in the Act itself. 28 U.S.C. § 2680(a) denies recovery under the Act to "any claim * * * based upon * * * the exercise or performance * * * [of] a discretionary function or duty on the part of a federal agency."

As indicated above, when the U. S. Engineers laid out the design and plans for Bellows Field, no new waters were diverted into the stream by virtue of the airport construction. The stream itself was straightened—thus the normal rate of flow was increased. There is no evidence that there were any exceptional circumstances faced by the planners requiring any more drainage protection than that based on the normal 2-year design storm frequency. There was nothing incorporated in the airport design to increase the ponding in the lands above the airport beyond that which was naturally there. As noted above, from the time the airport was built until the instant claims were made, no damage to the upper lands resulted from the *design* of the culverts.

Even if storms of greater magnitude than 2-year storms were fore-

---

4. The bridge was blown up by the army, after March, as a military exercise and not to destroy it as a stream obstruction.

5. In Koehnen there was also involved a diversion of flood waters.

**20**

seeable by the U. S. Engineers, their decision to construct the Bellows Field culverts on a 2-year design storm frequency was clearly a discretionary act at the planning level and no liability can here fall upon the Government for injuries claimed to have resulted from that decision.[6]

The Government was in no wise responsible to the plaintiff for any damage caused by the March 6, 1963, flooding. As to plaintiff's Second Claim for Relief, let judgment be entered thereon for the defendant.

---

6. Dalehite v. United States, 346 U.S. 15, 36, Note 31, 73 S.Ct. 956, 97 L.Ed. 1427 (1952); United States v. Ure, 225 F.2d 709 (9th Cir. 1955); United States v. Hunsucker, 314 F.2d 98 (9th Cir. 1962).