Benjamin T. GRACI, Jr. (Appearing herein for himself and on behalf of all other persons similarly situated)

v.

UNITED STATES of America.

Philip C. CIACCIO (Appearing herein for himself and on behalf of all other persons similarly situated)

v.

UNITED STATES of America.

Emanuel REID, Jr. (Appearing herein for himself and on behalf of all other persons similarly situated)

v.

UNITED STATES of America.

Civ. A. Nos. 15962, 15976, 16091.

United States District Court
E. D. Louisiana,
New Orleans Division.
June 27, 1969.

**948**

Jerald N. Andry, G. Gilbert V. Andry, III, Gibson Tucker, Jr., Tucker & Schonekas, New Orleans, La., for plaintiff Graci.

Joseph J. Laura, Jr., Ignatz G. Kiefer, New Orleans, La., for plaintiff Ciaccio.

Charles G. Jacques, Jr., Benjamin J. Birdsall, Jr., James F. Mulla, Jr., New Orleans, La., for plaintiff Reid.

Gene S. Palmisano, Fritz Veters, Asst. U. S. Attys., New Orleans, La., for the United States.

HEEBE, District Judge:

We are presented with the novel question of whether the immunity clause contained in § 3 of the Flood Control Act of 1928, 33 U.S.C. § 702c,[1] applies to actions for floodwater damage allegedly occasioned by the negligence of the government in the construction of a navigation aid project.

The issue is raised by way of a motion by the government for a rehearing of the court's previous ruling, through Judge Christenberry of this district, denying a motion to dismiss. The original motion was based on three separate grounds, and was denied by Judge Christenberry as to all three. The present motion seeks a rehearing of the previous ruling only with respect to the court's holding that these actions are not barred by the immunity provision of § 3 of the Act.[2]

These three consolidated cases are suits for property damage and related injuries affecting the various plaintiffs

---

1. Section 3 of the Act reads in pertinent part as follows:

   "No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place: *Provided, however*, That if in carrying out the purposes of this Act it shall be found that upon any stretch of the banks of the Mississippi River it is impracticable to construct levees, either because such construction is not economically justified or because such construction would unreasonably restrict the flood channel, and lands in such stretch of the river are subjected to overflow and damage which are not now overflowed or damaged by reason of the construction of levees on the opposite banks of the river, it shall be the duty of the Secretary of War and the Chief of Engineers to institute proceedings on behalf of the United States Government to acquire either the absolute ownership of the lands so subjected to overflow and damage or floodage rights over such lands." 45 Stat. 534, 535–536.

2. The two other grounds for the government's original motion were (1) that the plaintiffs' claims had prescribed and (2) that the plaintiffs' claims of negligence related to the performance by government employees of functions within the purview of the exclusionary section 421(a) of the FTCA, 28 U.S.C. § 2680(a). With respect to the latter ground, Judge Christenberry viewed the thrust of the government's motion to be the contention that the functions of the government employees engaged in construction of the Outlet were "discretionary" and held that that question was not ripe for consideration upon a motion to dismiss in view of the recent trend, under Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) and Rayonier, Inc. v. United States, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957), to view the discretionary function exception narrowly. But the government's reliance on § 2680(a) may have been additionally placed on the first clause of the section, which does not deal with the "discretionary function exception" at all.

occasioned by the encroachment of storm-driven waters upon their properties during Hurricane "Betsy" on September 17, 1965. Complainants charge that the flooding of their homes resulted from the overflowing and breakage of the Mississippi River-Gulf Outlet, a deep-water channel running through the lower extremities of the parishes of St. Bernard and Plaquemines, Louisiana,[3] and that the breakage was due to the negligent construction of the channel by the United States Corps of Engineers. Judge Christenberry held that the Mississippi River-Gulf Outlet was not a flood control project but a navigation aid project and that § 3 did not bar suits against the government for floodwater damage resulting from the government's negligence unconnected with flood control projects. The government admits the Outlet is a "navigation aid" and not a flood control project, but disputes the court's interpretation of § 3.

The government purports to base its motion for rehearing solely on the recent case of Parks v. United States, 370 F.2d 92 (2d Cir. 1966), which was rendered subsequent to the court's ruling on the original motion to dismiss. As we interpret the government's motion, however, it is based further on the proposition that the original denial of the motion to dismiss was contrary to the law at the time of the original ruling. As we read Parks, it added nothing new to the law pertinent to this case. The case did not involve a navigation aid project, but only reiterated the holdings of previous cases, applying the § 3 immunity in a situation involving a flood control project. Moreover, the Parks case was rendered on December 20, 1966, subsequent to the court's denial of the motion to dismiss but prior to the court's opinion in support of denial rendered June 13, 1967. In its memorandum, and at oral argument, the government in fact did not rely on Parks as a change in the law, but merely as a reiteration of settled principles. The real thrust of the present motion, therefore, is that the

---

That clause excepts from the general FTCA waiver of immunity "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid * * *." The government's contention apparently confused by the government itself with its argument with respect to the discretionary function clause, seems to have been that the construction of the River-Gulf Outlet was an "act of government employees *in the execution of a statute or regulation.*" The government's memo in support of the original motion showed that Public Law 455 of 1956, 70 Stat. 65, which authorized the construction of the Outlet, specifically authorized construction "substantially in accordance with the recommendation of the Chief of Engineers," which recommendation contained a complete description of the proposed channel. The government's argument seems to have been that the authorizing act, which by reference contained the Chief of Engineer's description of the Outlet, was a "statute" as that term is used in the first clause of § 2680(a), and that the Outlet insofar as it conforms to the proposed description contained by reference to P.L. 455 cannot be attacked, the only possible issue of liability then being whether or not the Corps of Engineers "exercised due care" in following the statutory instructions. The government failed to re-urge this argument before us, as they obviously failed to do with sufficient clarity before Judge Christenberry.

3. The "Outlet" was partially completed for use in July of 1963, at a total construction cost as of January 30, 1967, of $60,182,400 excluding maintenance costs. The channel is approximately 66 miles long, including approximately 46 miles of "land cut," extending from the northern end of the Chandelier Island group to an intersection with the Industrial Canal at Michoud, Louisiana. The Outlet enables ships from ports east of the Mississippi River to head north for New Orleans at Breton Sound, many miles east of the river mouth, at a substantial saving of distance traveled. Presently, ships passing from Breton Sound through the Outlet into the Industrial Canal and thence to the river, must sacrifice some time because of inadequate lock facilities and because of this only two or three ships a day make use of the route; but when construction is complete, traffic is expected to greatly increase.

denial of the motion to dismiss, with respect to the court's interpretation of § 3, was ill-founded and should now be reconsidered.

■ We dispense at once with the contention of counsel for plaintiff in Civil Action 15962 that this motion for rehearing is equivalent to a motion for a new trial and therefore governed by the time limits of Rule 59(b), F.R.Civ.P. The motion for new trial is, more often than not, an anticlimactic appearance before the trial court prior to the instigation of the appellate processes. Time is then of the essence, for the protection of the rights of other parties. But a motion addressed to the trial court for a reconsideration of an interlocutory order is proper at any time prior to the final determination of the merits.

Although the considerations for the granting of a motion for rehearing may be different from those pertaining to a decision on the merits of the matter once it has been reheard, the prime consideration in the granting of the rehearing is always a strong possibility that the original determination may have been, or may have become, incorrect. Here, the government's request for rehearing is based, not on any change in the law, but on the alleged impropriety of Judge Christenberry's original ruling. Although we might be inclined in other circumstances to grant a rehearing on a showing of the *possibility* of error in the original determination and the need for further argument on the merits, we see no reason to do so where we have had the opportunity for thorough consideration, with the aid of extensive memoranda and arguments of counsel, and find ourselves in accord with the determination of the merits of the original motion.

■ In considering the merits of the government's original motion to dismiss, we are not hampered by the apprehension that we are "bound" by Judge Christenberry's determination. As a matter of deference and respect, we would seriously hesitate to overturn any ruling of our respected contemporary. Moreover, in view of the recent general reallotment of

cases in this district, we deem it necessary to carefully consider requests for the rehearing of any matter previously passed on by another judge of this district prior to the general reallotment; to refer the case back to the original judge in each and every instance in which a rehearing of an interlocutory decision is requested, as suggested by the Third Circuit in United States v. Wheeler, 256 F.2d 745 (1958), would drastically confuse the court's docket, and the wholesale reconsideration of previous orders merely on the basis of unwarranted motions for rehearing would, in the situation now prevailing, have the same result. But we do not read the law in this circuit as prohibiting all reconsiderations of issues passed on by our fellow judges. The matter is one within "the sound discretion of a trial judge conducting his court in the interest of furthering the administration of justice." United States v. Koenig, 290 F.2d 166, 172 (5th Cir. 1961), cited by ACF Industries, Inc. v. Guinn, 384 F.2d 15 (5th Cir. 1967), cert. den. 390 U.S. 949, 88 S.Ct. 1039, 19 L.Ed.2d 1140 (1968).

The situation prevailing in this district due to the general reallotment may well have an influence on the exercise of "the sound discretion" of each judge, but the usual factors must still play the major part in the decision. Certainly, a single judge is not prevented by "the law of the case" from overruling his own interlocutory decisions if he later finds them to have been incorrect. See Jaros v. State Farm Mutual Automobile Insurance Co., 261 F.Supp. 315 (E.D.La. 1966). And where another consideration of the merits is warranted, we feel free to undertake it within the bounds of proper discretion without considering ourselves irrevocably bound to the prior determination.

■ Turning, then, to the merits of the government's original motion, we find that these tort actions are maintainable against the government under the provisions of the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq., and that § 3 of the

Flood Control Act of 1928, 33 U.S.C. § 702c, does not necessarily override the Federal Tort Claims Act's waiver of immunity in the particular circumstances of this case. The extent of our holding is only to deny the government's motion to dismiss on the basis of § 3; we refrain from offering any impression as to the merits of the plaintiffs' actions.

Contrary to the usually narrow approach to statutory waivers of the sovereign immunity, see United States v. M/V Pitcairn, 272 F.Supp. 518, 522 (E.D.La.1967), the Federal Tort Claims Act has received a very liberal construction in this circuit,[4] consistent with the salutary Congressional policy determination to make the United States liable in tort to persons who have been injured by the negligent or wrongful acts of its employees within the general coverage of the Act, in the same respect as any private person. Cf. United States v. Yellow Cab Co., 340 U.S. 543, 71 S.Ct. 399, 95 L.Ed. 523 (1951). Whatever may have been the more immediate pragmatic motives for its passage, they do not detract from the Act's progressive purpose.[5]

National Manufacturing Co. v. United States, 210 F.2d 263 (8th Cir. 1954), the landmark decision in the history of § 3, first upheld the vitality of the immunity provision of § 3 in the face of the broad waiver provisions of the Federal Tort Claims Act. The court found in § 3 the expression of a settled public policy aligned with the sovereign immunity principle, which barred all claims against the *United States* for floodwater damage. The court stated generally "[a] long settled public policy is not to be overriden by the general terms of a statute which does not show with certainty a legislative intent to depart from that policy," 210 F.2d at 274, and in particular, that " * * * it should not lightly be assumed that the fundamental policy [of § 3] was reversed by mere implication * * * " of the Federal Tort Claims Act. *Ibid.*

Notwithstanding the validity of such general statements, we think a great deal depends upon the extent of the policy in question, and its reasonableness. Section 3 does represent a reasonable public policy determination to secure the government from liability for floodwater damage connected with flood control projects; but we hold that it should not be interpreted as a wholesale immunization from all liability for floodwater damage unconnected with flood control projects, and that insofar as § 3 is to be interpreted, it stands on a less crucial basis and is superseded by the general waiver of immunity of the Federal Tort Claims Act.

The *National Manufacturing Company* case held the government immune from liability for floodwater damage caused by acts unrelated to the government's flood control works. Insofar as this holding was grounded on the simple reference to § 3, we respectfully differ here with the 8th Circuit's opinion. However, the decision was based on several equally important grounds in addi-

---

4. Early lower court decisions, including those of the Fifth Circuit, almost unanimously took a narrow view of the FTCA waiver, see 1 A.L.R.2d 222, 225. But United States v. Yellow Cab, 340 U.S. 543, 71 S.Ct. 399, 95 L.Ed. 523 (1951), called for a liberal interpretation, and the Fifth Circuit followed suit in United States v. Alexander, 238 F.2d 314, 62 A.L.R.2d 1329 (5th Cir. 1956).

5. Thus, we do not deem controlling the Supreme Court's observation in *Yellow Cab* that the moving force behind the Congressional action on the Bill was "the benefits to be derived from relieving Congress of the pressure of private claims," 340 U.S. at 550, 71 S.Ct. at 404, or the fact that private appeals to Congress for relief from floodwater property damage have been consistently rejected, see National Mfg. Co. v. United States, 210 F.2d 263, 272, n. 3. In *Yellow Cab*, immediately following the observation quoted, the court stated, "Recognizing such a clearly defined breadth of purpose [relief from 'the *pressure* of private claims'] for the bill as a whole *and the general trend toward increasing the scope of the waiver by the United States of its sovereign immunity from suit*, it is inconsistent to whittle it down by refine-

tion to the § 3 reliance.[6]  Moreover, it is significant that the flood involved in *National Manufacturing Company* occurred on the Kansas River, a natural waterway traditionally subject to flooding and upon which the national government had engaged in an extensive program of flood control.  It can at least be said that in the *National Manufacturing Company* case, in contrast to the facts of this case, a natural river and a federal flood control program were involved.

Also significant is much of the language used by the court, in clarification of its actual holding with respect to § 3.  Despite the express opinion of the court that § 3 was meant to "safeguard[ed] the United States against liability of any kind for damage from or by floods or flood waters in the broadest and most emphatic language," 210 F.2d at 270, the opinion continues with this "explanation" of the *reason* for the use of such "emphatic language" in § 3:

> "The cost of the flood control works itself would inevitably be very great and Congress plainly manifested its will that those costs should not have the flood damages that will inevitably recur added to them.  Undoubtedly floods which have traditionally been deemed 'Acts of God' wreak the greatest property destruction of all natural catastrophies and *where floods occur after flood control work has been done and relied on the damages are vastly increased*.  But there is no question of the power and right of Congress to keep the government entirely free from liability when floods occur, notwithstanding the great government

works undertaken to minimize them." 210 F.2d at 270.  (Emphasis supplied.)

\*    \*    \*    \*    \*    \*

> "So that uniformly and throughout the country at any place where there is damage 'from' or 'by' a flood or flood waters *in spite of and notwithstanding federal flood control works* no liability of any kind may attach to or rest upon the United States therefor."  210 F.2d at 271.  (Emphasis supplied.)

One could not wish for a more lucid statement of the rationale of the § 3 immunity:  that an immunity from liability for floodwater damage arising *in connection with flood control works* was the condition upon which the government decided to enter into the area of nationwide flood control programs.  But there is no reasonable basis to suppose that the government entered into flood control works *in exchange for* a complete immunity from liability for the negligent and wrongful acts of its employees *unconnected* with flood control projects.  It has been held that § 3 immunizes the government from liability for floodwater damage in areas not yet reached by federal flood control works, cf. Atkinson Co. v. Merritt, Chapman & Scott Corp., 126 F.Supp. 406 (N.D.Cal.1954); Valley Cattle Co. v. United States, 258 F.Supp. 12, 16 (D.Hawaii 1966), but only in areas of "*potential* flood control projects," 258 F.Supp. at 16, and presumably absent any other active governmental operations which might constitute wrongful conduct.

Although there have been at least a dozen decisions bearing on § 3, most of

---

ments."  (Emphasis added.)  340 U.S. at 550, 71 S.Ct. at 404.

6.  The majority opinion was grounded as well on the express holding that the negligence alleged came within the exceptions to the waiver of the FTCA contained in 28 U.S.C. § 2680(a) and § 2680 (h).  In addition, the concurring opinion, in which *two* of the three judges joined, found an equally important consideration to be that the plaintiffs' claims,

which were based solely on the alleged failure of the government's weather forecasters to properly warn the public of the impending flood, were forestalled by "the equally absolute policy which has always existed in the common law, that the dissemination or nondissemination of public information, not of a personal character, *is without any basis of a tort* in respect to its accuracy."  (Emphasis added.)  210 F.2d 263, 279.

which have relied on National Manufacturing Co. v. United States in finding § 3 unaffected by the Federal Tort Claims Act, only the *National Manufacturing Company* case itself dealt with floodwater damage allegedly resulting from government negligence distinct from government flood control operations and found the government immune.[7] Statements of the rationale of § 3 similar to those quoted from the *National Manufacturing Company* opinion appear in many of the cases. In B. Amusement Company v. United States, 180 F.Supp. 386, 148 Ct.Cl. 337 (1960), relied on by the government here, the court actually considered the possibility of recovery against the government in equity (the court felt that § 3 would not bar an *"equitable"* claim), but denied it stating:

> "The United States has a constitutional right, even a duty, to improve navigation and protect against floods, * * *. To say that, if it does enter into plans of improvement, it will stand liable for damage *regardless of negligence* would be an absurd rule, and one contrary to the expressed will of Congress embodied in [§ 3]. * * * We must conclude, on the basis of all the facts, that the United States is not equitably responsible for the plaintiffs' damages, *since it is in no way at fault*." 180 F.Supp. at 390–391. (Emphasis supplied.)

In Valley Cattle Co. v. United States, 258 F.Supp. 12 (D.Hawaii 1966), the

court quoted this lucid explanation of the immunity's limitations:

> "The purpose of [§ 3] was 'to prevent the Government from being held liable for the staggering amount of damage caused by natural floods, merely because the Government had embarked upon a vast program of flood control in an effort to alleviate the effect of the floods. Because floods could not be eliminated in a single year, flood damage was bound to recur, and Congress did not want to burden its efforts to lessen the total effect of the floods with the cost of the damage that was certain to result in spite of its efforts. * * *' Atkinson Co. v. Merritt, Chapman & Scott Corp., 126 F.Supp. 406, 408–409, N.D.Cal.1954." 258 F.Supp. 16.

Our investigation of the legislative history of § 3 reveals it to be scant, but the very scarcity of legislative comment emphasizes the propriety of a reasonable and consistent interpretation. What few references there are to the provision strengthen this approach.[8]

Against the weight of a rational and consistent interpretation of § 3, the government argues that the wording of the section should be viewed out of the context of the 1928 Flood Control Act of which it is a part. To a certain extent this is a valid approach. Cf. Peerless Serum Co. v. United States, 114 F.Supp. 662 (W.D.Mo.1953); Clark v. United States, 109 F.Supp. 213 (D.C.Or.1952), aff'd. 218 F.2d 446 (9 Cir.).[9] However,

---

7. Moreover, several cases have actually avoided the application of the immunity in situations involving flooding, where government negligence was an active force contributing to the flood, on the theory that the inundation of water in each case was not a "flood" at all. See Valley Cattle Co. v. United States, 258 F.Supp. 12 (D.Hawaii 1966); Peterson v. United States, 367 F.2d 271 (9th Cir. 1966); Atkinson Co. v. Merritt, Chapman & Scott Corp., 126 F.Supp. 406, 409 (N.D.Cal. 1954).

8. At no time during the long history of the Bill S. 3740 and its contemporaries was the question of immunity raised until shortly before the final version was resolved

and enacted into law. The immunity proviso was not contained in any form in the Bill as it was first introduced or while it made its first trip through both houses of Congress. The provision was part of an amendment offered in connection with a Federal-State issue late in the proceedings. The only comment concerning the provision which our search has disclosed was made by a member on the floor of the House to the effect that in engaging itself in flood control works, the government should not lay itself open to suits for flood damage. See 69 Cong. Rec. 7022.

9. These decisions held § 3 applicable, not only to the Mississippi River and its

the government would like to go still further, to read § 3 *within the context* of the whole of Chapter 15 of Title 33 of the United States Code. Title 33 is entitled "Navigation and Navigable Waters," and Chapter 15 deals with "Flood Control." The Title 33 codification has not yet been revised and enacted into positive law as have other titles of the Code. See United States Code, 1964 Edition, Preface of the Chairman, Committee on the Judiciary of the House of Representatives (January 3, 1965). For this reason, less reliance on the codification is called for than might otherwise be the case. Moreover, the Title 33 codification is particularly redundant in connection with the introductory sections cited by the government. Although the § 3 immunity is not to be limited strictly to situations covered by the Flood Control Act of 1928, see *Peerless Serum* and *Clark, supra,* we do not think that it must be held to cover government negligence in navigation aid projects merely because the word "navigation" appears in Title 33. Similarly, the statement in the 1936 Flood Control Act, which included some provision for navigation aid projects, that "Nothing in this Act shall be construed as repealing or amending any provisions of the [1928 Act] or any provision of any law amendatory thereof," cannot be taken as an application of the immunity provision of § 3 to situations involving navigation aid projects, or any other federal projects or operations unconnected with flood control.[10]

Our decision is not predicated solely on our construction of § 3. We are equally prompted by our inability to accept this immunity provision, reasonably related to government involvement in flood control programs, as an absolute insulation from liability for all wrongful acts in other situations, contrary to the express policy of the Federal Tort Claims Act that the government should be held liable for the wrongful acts of its employees in the same respect as private persons. Insofar as provisions for federal nonliability for floodwater damage under § 3 is totally dissociated from federal involvement in flood control programs, it should be held superseded by the general liberal waiver of immunity of the Federal Tort Claims Act. To the same extent, the line of cases prior to the 1928 Act which developed the rule of absolute nonliability of the federal government for flood damage, we now hold superseded by the FTCA.

The line of cases [11] to which we refer stems from Bedford v. United States, 192 U.S. 217, 24 S.Ct. 238, 48 L.Ed. 414 (1904). There, certain riparian landowners on the Mississippi River sued the United States for the erosion and flooding of their lands allegedly occasioned by government works upriver; the work consisted of a revetment built along one bank of the river, which the court noted did not change the course of the river but operated only to keep the course of the river at the point as it then was. If the revetment had not been built, the river would have continued to widen toward the Louisiana bank of the river. The object of the construction was to prevent the navigable channel of the

tributaries (the subjects of the 1928 Act), but to all natural waterways across the country.

10. Here again we differ with the 8th Circuit's opinion in National Mfg. Co. v. United States, 210 F.2d 263, 270.

11. See the cases cited in Atchley v. Tennessee Valley Authority, 69 F.Supp. 952, 954 n. 1 (N.D.Ala.1947). The *Atchley* opinion itself is interesting in that it skirts the problem of the conflict between the FTCA and the public policy of nonliability for "consequential damages" arising out of the construction or operation of navigation improvements evolved by the cases decided prior to the Act. *Atchley* avoided the issue in finding the "discretionary function" exception of the FTCA applicable; moreover, the court noted that the TVA had been expressly excepted from the FTCA waiver by § 421(e) of the Act, 28 U.S.C. § 2680(*l*). 69 F.Supp. at 955 n. 4.

river from receding farther from the City of Vicksburg, which was located on the opposite bank. Absent the revetment, the shifting of the channel would have proceeded, the angle of the bend in the river would have gradually become less abrupt, and the deflection of the stream upon the claimants' land would have grown less. The trial court deduced from the facts that the claimants were not entitled to recover, and on that basis dismissed the petitions. The Supreme Court emphasized the rights of private riparian landowners to protect the erosion of their properties, equating to these the rights of the government in the exercise of its power over navigable rivers. The court stated:

"[The plaintiffs assert] a right in a riparian proprietor to the unrestrained operation of natural causes, and that works of the government which resist or disturb those causes, if injury result to riparian owners, have the effect of taking private property for public uses within the meaning of the 5th Amendment * * *. The consequences of the contention immediately challenge its soundness. What is its limit? Is only the government so restrained? Why not as well riparian proprietors, are they also forbidden to resist natural causes, whatever devastation by floods or erosion threaten their property? * * * And if the government is responsible to one landowner below the works, why not to all landowners? * * * Asserting the rights of riparian property it might make that property valueless. Conceding the power of the government over navigable rivers, it would make that power impossible of exercise, or would prevent its exercise by the dread of an immeasurable responsibility." 192 U.S. 223–224, 24 S.Ct. 940.

There may be a valid governmental interest in avoiding liability for floods in connection with navigation improvement projects; the great public interest served by these projects might be inhibited by a willingness of courts to permit what could well become an avalanche of suits in such cases. But we do not think that such an interest, absent its expression in positive law, warrants the complete and absolute prohibition of all suits against the government for floodwater damage in the face of the more liberal policy of the Federal Tort Claims Act. We think the public interest in navigation improvements and in the avoidance to that end of burdensome litigation is better served, consistent with the policy considerations of the FTCA, by an equitable approach which might severely inhibit suits for flood damage, but at the same time leave certain avenues open for action in cases of flagrant wrongdoing. The cases which in the past have forestalled suits against the government for flood damage apart from § 3 considerations are expressions of a valid concern over the prohibitive effect a permissive attitude might have on the nation's continuing navigation improvement works. But the leading cases have denied recovery on the merits, not by way of the abrupt dismissal the government seeks here. We find no express determination in the cases prior to the introduction of § 3 that any and all possible claims based on wrongdoing imputable to the government are prohibited on the sole circumstance that floodwater damage is involved. Whatever expression there may have been to that effect we now find modified by the FTCA.

We might accept § 3 of the 1928 Act, were we called upon to do so, as insulating the government from all liability for floodwater damage which might in any real way be connected with possible negligence in flood control operations. Navigation aid works, and perhaps even operations such as weather forecasting (Cf. National Maufacturing Co. v. United States, *supra*), resulting in flood damage in conjunction with the flooding of natural rivers subject to present or potential flood control works, might be insulated with a view to pro-

tecting the government from even the harassment of lawsuits in connection with the federal flood control program which might otherwise tend to multiply in the face of a less strict interpretation. But in the case of a project such as this River-Gulf Outlet, totally unrelated to any natural waterway or the national flood control program, we think that the *possibility* of recovery against the government for any and all degrees of negligence and wrongful actions of its employees under the Federal Tort Claims Act should not be abruptly cut off by outright dismissal merely because the injuries involved were the result of an encroachment of flood waters.

We hasten to indicate a severe limitation on the possibilities of recovery by these plaintiffs, however. The burden of proof which the plaintiffs carry here will be unusually onerous. We find the limitation, not in an uncomprisingly strict interpretation of § 3, but in the more flexible concepts of ordinary negligence, applicable to private persons as well as the government under the FTCA. The principle in determining the negligent character of the acts of defendants, particularly applicable in cases involving such necessary public works as this navigation aid project, is merely that

> "Against [the] probability, and gravity, of the risk, must be balanced in every case *the utility of the type of conduct in question."* Prosser on Torts, 3rd Edition, p. 151. (Emphasis supplied.)

The determination of whether or not the government has acted "reasonably" in the circumstances of this case will depend as much upon the public need, or "utility," of this navigation channel and the very high burden and the difficulties involved in totally protecting against dangers of its flooding, as it will upon the factors on the other balance of the scale: the risk of flooding, and the ease with which there might have been greater precautions than actually were taken. "Chief among the factors [in any case] is the social value of the interest which the actor is seeking to advance," Prosser, *supra,* p. 151.[12] In this case, the government was undeniably engaged in operations of very great social value. The plaintiffs will have a correspondingly greater burden to point to other factors which might outweigh this important consideration. Gross failure on the government's part to take the simplest precautionary and safety measures would be decisive. We are not prepared to elaborate further on the possible development of these cases along these lines. Suffice it to say that, although neither § 3 of the 1928 Flood Control Act nor the general seemingly inflexible statements in the cases of an earlier era, may totally insulate the government from liability for any and all wrongdoing in the construction of this channel, the United States is not left without any defenses; the government may be liable for negligence under the Federal Tort Claims Act, but proof of "negligence" in the circumstances of these cases and others like them will not prove an easy matter.

Accordingly, the motion of the United States for a rehearing on their previous motions to dismiss in these three actions is hereby denied and rejected.

12. Cf. United States v. Carroll Towing Co., 159 F.2d 169 (2d Cir. 1947); Babington v. Yellow Taxi Corp., 250 N.Y. 14, 164 N.E. 726, 61 A.L.R. 1354 (1928); Chicago, B. & Q. R. Co. v. Krayenbuhl, 65 Neb. 889, 91 N.W. 880, 59 L.R.A. 920 (1902). "The public interest will justify the use of dangerous machinery so long as the benefits outweigh the risk, and a railroad may reasonably be constructed near a highway, even at the expense of some danger to those who use it. * * * A county will not be required, at ruinous expense, to build a bridge which will be safe against any accident which might be anticipated; but it may\at least be required to post a warning." (citations omitted) Prosser on Torts, 2d Ed., pp. 122–123.