Donald J. PETERSON and Louise J. Peterson, Appellants,

v.

UNITED STATES of America, Appellee.

No. 20238.

United States Court of Appeals Ninth Circuit.

Oct. 5, 1966.

Rehearing Denied Dec. 13, 1966.

Eugene R. Belland, Fairbanks, Alaska, for appellants.

John W. Douglas, Asst. Atty. Gen., Morton Hollander, Kathryn H. Baldwin, Attys., Dept. of Justice, Washington, D. C., Richard L. McVeigh, U. S. Atty., Anchorage, Alaska, for appellee.

Before JERTBERG, BROWNING and ELY, Circuit Judges.

JERTBERG, Circuit Judge.

Appellants seek a judgment against the United States under the provisions of the Federal Tort Claims Act, 28 U.S.C. § 1346(b) and 28 U.S.C. § 2671 et seq., to recover money damages for injury and loss of property allegedly caused by negligence when, without warning of any kind to appellants, a group of engineers attached to the Ladd Air Force Base at Fairbanks, Alaska, caused to be dynamited an ice jam which had accumulated from natural causes in a bend of the Chena River, thereby disrupting the normal and natural breakup of ice in said river and causing to be discharged downstream a large accumulation of ice and an immense volume of water, the proximate result of which was to damage and destroy appellants' property consisting of vessels and miscellaneous equipment located on the Chena River approximately five miles downstream from the ice jam. The ice jam formed in a bend of the river within the boundaries of Ladd Air Force Base, now known as Fort Wainwright. The dynamiting operations were carried out by United States Air Force personnel, pursuant to instructions of the Engineering Officers of the Base.

The facts are not in dispute and a detailed account of them may be found in the District Court's opinion reported at 217 F.Supp. 867 (D.Alaska, 1963).

The District Court concluded that:

"II

"Title 33 U.S.C.A., Section 702c applies to all floods and flood waters which result in whole or in part from unusual or extraordinary climatic conditions.

"III

"The water and ice which damaged the plaintiffs' vessels on May 3, 1960, were a part of a flood, within the meaning of the terms 'floods or flood waters' as used in Title 33 U.S.C.A., Section 702c. Section 702c of Title 33 U.S.C.A. therefore provides the defendant, United States of America, with a complete legal defense to this action."

Judgment was entered dismissing the complaint and the cause of action therein set forth with prejudice.

The foregoing conclusions of law are based upon the following findings of fact of the District Court:

"FINDINGS OF FACT

"I

"Plaintiffs commenced this action pursuant to 28 U.S.Code, Section 1346(b) and 2671–2680, to recover damages for injury and loss of property allegedly caused by the negligent dynamiting of an ice jam which had formed in the Chena River within the boundaries of Ladd Air Force Base near Fairbanks, Alaska, on May 2, 1960, by representatives of an Air Force Ordnance Group at the request and direction of the Corps of Engineers.

"II

"Plaintiffs were the owners of the following registered vessels, with appurtenances, miscellaneous facilities, equipment, tools, fuel and supplies used in conjunction therewith:

| Name of Vessel | Bureau of Customs Official No. | Type of Vessel |
| --- | --- | --- |
| ELAINE G. | 258597 | Oil Stern Wheel |
| BONNIE G. | 265321 | Oil Stern Wheel |
| COLLEEN | 275992 | Scow |
| MARTHA | 275993 | Scow |
| BARGE NO. 2 | 249013 | Scow |

"III

"The Chena River, also known as the Chena Slough, downstream, and for some distance upstream, from University Avenue, near Fairbanks, Alaska, is a navigable water of the United States of America.

"IV

"Prior to May 2, 1960, Federal funds had been expended for studies, preliminary examinations, surveys, reports and the construction of a levee and aid of control of destructive flood waters on the Chena River.

"V

"On and immediately prior to May 2, 1960, plaintiffs' vessels, with the exception of the BONNIE G were moored and floating in the waters of the Chena River near a site on the south shore of said river known as Peterson's Landing. The BONNIE G had been taken out of the river in the fall of 1958 and was resting on logs on the north shore of the river a short distance upstream from Peterson's Landing.

"VI

"During the spring of 1960 unusual and extraordinary climatic conditions existed in the headwaters and drainage areas of the Chena River causing the snow to melt and run off into said river in a period of about three days. This caused the river to rise significantly between May 1st and the morning of May 2nd.

"VII

"The water from this run-off came so fast that it caused the ice in the Chena River to rise or lift and to move. As a result thereof an ice jam, caused solely by natural forces, formed in the Chena River, within the boundaries of Ladd Air Force Base on May 2, 1960, at about 2:00 p. m.

"VIII

"By reason of said ice jam, water and ice became impounded, causing the waters of the Chena River to overflow their natural banks and channels and to flood certain areas on Ladd Air Force Base and in certain areas near Badger Road, including residential areas.

"IX

"To alleviate and control the flood waters and in an attempt to prevent further damage in the Badger Road area, at Ladd Air Force Base and in the Fairbanks area, the Corps of Engineers caused the ice jam to be dynamited.

"X

"As a result of this action on the part of the Corps of Engineers, the water and ice impounded by the ice jam was released and proceeded downriver, and plaintiffs' vessels were thereby damaged."

It is clear from the record and the opinion of the District Court that the use by the District Court of the term "Corps of Engineers" in the above findings of fact is not to denote a specific branch of the Department of the Army designated as the "Corps of Engineers", but is used instead to denote the group of engineers who participated in the decision to dynamite and the dynamiting of the ice jam, i. e., the Base Civil Engineer, the Deputy Base Civil Engineer, the Resident Engineer, and the Director of Materiel, all of the Ladd Air Force Base, and the City Engineer of the City of Fairbanks, Alaska. We make the foregoing statement only for the reason that the following statement appears in the opinion of the District Court, supra, at page 870:

"The responsibility for flood control is conferred by Congress on the Department of the Army under the direction of the Secretary of the Army (formerly the Secretary of War) and supervision of the Chief of Engineers."

There is no evidence in the record that that "Corps of Engineers", as such, participated in the decision to dynamite and in the dynamiting of the ice jam.

Neither in its findings of fact nor its memorandum opinion did the District Court purport to pass upon, in any way, the issues which were framed in the pleadings and the pre-trial orders in respect to the claim of appellants under the Federal Tort Claims Act [28 U.S.C. §§ 1346(b) and 2671 et seq.], such as:

1. The alleged negligent acts on the part of the employees and officers of the government which were asserted to be the proximate cause of appellants' claim of damages;

2. Whether the United States, if a private person, would be liable to the appellants in accordance with the laws of the State of Alaska where the claims, acts, or omissions occurred; and

3. The "discretionary function" exception of 28 U.S.C. § 2680(a).

Neither did the District Court, in any way, pass upon the affirmative defense asserted by the Government that it is not liable under the privilege of public necessity.

In our discussion we will confine this opinion solely to the ground upon which the District Court dismissed, with prejudice, the cause of action set forth in appellants' complaint.

Section 702c, in pertinent part reads as follows:

"No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place:" 45 Stat. 535 (1928), 33 U.S.C. § 702c.

Section 702c was first enacted as part of Section 3 of the Act of May 15, 1928, entitled "An Act for the Control of Floods on the Mississippi River and its tributaries, and for other purposes." [45 Stat. 535 (1928).] In the Flood Control Act of June 22, 1936, [49 Stat. 1570 (1936)], Congress affirmed the application to the 1936 Act of the general provisions of the 1928 Act, including Section 3. In the 1936 Act, Congress adopted and authorized to be prosecuted as "works of improvement, for the benefit of navigation and the control of destructive flood waters and other purposes"

hundreds of flood control projects in all parts of the country, including an authorization and direction to the Secretary of War to cause preliminary examinations and surveys for flood control on the Tanana River and Chena Slough, Alaska. 49 Stat. 1570, 1592, 1596.

In the leading case of National Mfg. Co. v. United States, 210 F.2d 263, 270 (8th Cir.), cert. denied 347 U.S. 967, 270–271, 74 S.Ct. 778, 98 L.Ed. 1108 (1954), appears the following statement of the intent and purpose of Congress in the enactment of Sec. 702c:

"Thus it appears on inspection of the two flood control Acts referred to [the Acts of May 15, 1928, and the Flood Control Act of June 22, 1936], that when Congress entered upon flood control on the great scale contemplated by the Acts it safeguarded the United States against liability of any kind for damage from or by floods or flood waters in the broadest and most emphatic language. The cost of the flood control works itself would inevitably be very great and Congress plainly manifested its will that those costs should not have the flood damages that will inevitably recur added to them. Undoubtedly floods which have traditionally been deemed 'Acts of God' wreak the greatest property destruction of all natural catastrophies and where floods occur after flood control work has been done and relied on the damages are vastly increased. *But there is no question of the power and right of Congress to keep the government entirely free from liability when floods occur, notwithstanding the great government works undertaken to minimize them.* Congress included Section 3 in the 1928 Act and carried it forward in the 1936 Act and others with intent to exercise that power completely and to absolutely bar any such federal liability. (Italics added.)

" * * *. The Federal Tort Claims Act of August 2, 1946, had not been passed in 1928 or 1936 and the government then had a certain sovereign immunity from suit for torts but when

Section 3 is read in its context it is clear Congress meant by it that damages from or by floods or flood waters should not afford any basis of liability against the United States regardless of whether the sovereign immunity was availed of or not. *The declaration of Section 3 negates the existence of a cause of action against the United States in the situation covered by it.* (Italics added.)

"Undoubtedly that absolute freedom of the government from liability for flood damages is and has been a factor of the greatest importance in the extent to which Congress has been and is willing to make appropriations for flood control and to engage in costly undertakings to reduce flood damages." (Footnote omitted.)

The District Court granted the government complete immunity from liability on its conclusions that Section 702c applies to all floods and flood waters that result in whole or in part from unusual or extraordinary climatic conditions, and that the ice and water which damaged appellants' vessels were part of a flood within the meaning of the terms "flood or flood waters" as used in Title 33 U.S.C. Sec. 702c, because of its finding of fact that prior to May 2, 1960, federal funds had been expended for studies, preliminary examinations, surveys, reports and the construction of a levee and aid of control of flood waters on the Chena River.

Appellants do not seek to fasten liability upon the government upon any theory grounded upon any expenditure of federal funds for studies, preliminary examinations, surveys, reports, or construction in aid of control of destructive flood waters on the Chena River. They do not seek to recover damages caused by floods or flood waters which occurred in spite of and notwithstanding the expenditure of federal funds for surveys, etc., and the construction of a levee.

The decision to dynamite the ice jam was wholly unrelated to any Act of Congress authorizing expenditures of federal funds for flood control, or any act undertaken pursuant to any such authorization. Rather, the decision to dynamite the ice jam was made, as stated in Finding of Fact IX, supra, to alleviate and control the flood waters in an attempt to prevent further damage in the Badger Road Area at Ladd Air Force Base, and in the Fairbanks area.

Appellants seek to fasten liability upon the government for injury and loss of property allegedly caused by negligence when, without warning of any kind to them, a group of engineers attached to the Ladd Air Force Base at Fairbanks caused to be dynamited an ice jam which accumulated from natural causes in a bend of the Chena River thereby disrupting the normal and natural breakup of ice in said river and causing to be discharged downstream a large accumulation of ice and an immense volume of water, the proximate result of which was to damage and destroy appellants' property.

In our view Section 702c must be viewed in proper context. We are unaware of any liability which existed on the part of the United States toward other parties for damages suffered to life or property caused solely by flood or flood waters of a navigable river since no duty was imposed upon the United States, as a sovereign, to control a navigable river simply because such river may be subject to the jurisdiction of the United States under one or more clauses of the Constitution of the United States.

■ When Section 702c was enacted in 1928, and re-enacted in 1936, the Federal Tort Claims Act had not been enacted, and the United States, broadly speaking, possessed sovereign immunity from actions sounding in tort. Hence, it cannot be asserted that Congress intended Section 702c to be but a declaration of existing law. Rather, it is clear that Congress intended by the enactment of Section 702c in the Act of May 15, 1928, and in similar subsequent flood control Acts to be an integral part of a plan or policy on the part of the Government to embark on a vast construction program to prevent or minimize the incidences of

loss occurring from floods and flood waters by the building of dikes, dams, levees, and related works, and to keep the Government entirely free from liability for damages when loss occurs, notwithstanding the works undertaken by the Government to minimize it.

■■ We believe that the District Court, in the situation presented by the record before us, painted with too broad a brush in its conclusions that Section 702c applies to all floods and flood waters which result in whole or in part from unusual or extraordinary climatic conditions, and that the water and ice which damaged plaintiffs' vessels were part of a flood within the meaning of the terms "flood or flood waters" as used in Title 33 U.S.C. Section 702c. In our view the District Court erred in its application of Section 702c to this case.

We have reviewed three decisions heavily relied upon by the District Court in support of its decision, and heavily relied upon by the United States in support of the judgment. These cases are National Mfg. Co. v. United States, supra; Stover v. United States, 332 F.2d 204 (9th Cir. 1964); and Clark v. United States, 218 F.2d 446 (9th Cir. 1954). In all three cases Section 702c was applied to insulate the United States from liability. None of them involved a factual situation in any way comparable to the factual situation in the instant case. Each of such cases is clearly distinguishable on the facts from the instant case. For that reason we find them to be inapposite in light of the unusual, factual situation presented by the record before us.

The judgment of the District Court is vacated and set aside and the cause is remanded to the District Court for reconsideration and redetermination of the liability of the Government under the issues framed in respect to the claim of the appellants under the Federal Tort Claims Act and any affirmative defense not disposed of in this opinion. Such reconsideration and redetermination shall be, in the discretion of the District Judge, on the present record or as supplemented by further hearings.