Benjamin T. GRACI, Jr., Plaintiff-Appellee,

v.

UNITED STATES of America, Defendant-Appellant.

Philip C. CIACCIO, Plaintiff-Appellee,

v.

UNITED STATES of America, Defendant-Appellant.

Emanuel REID, Jr., Plaintiff-Appellee,

v.

UNITED STATES of America, Defendant-Appellant.

No. 29015.

United States Court of Appeals, Fifth Circuit.

May 21, 1971.

Gerald J. Gallinghouse, U. S. Atty., New Orleans, La., Morton Hollander, Chief, Appellate Section, Kathryn H. Baldwin, Robert V. Zener, Attys., U. S. Dept. of Justice, Washington, D. C., for defendant-appellant.

Evangeline M. Vavrick, New Orleans, La., Amicus Curiae.

Jerald N. Andry, Gibson Tucker, Jr., Joseph J. Laura, Jr., Ignatz G. Kiefer, Charles G. Jacques, Jr., James F. Mulla, Jr., New Orleans, La., for plaintiff-appellee.

Before JOHN R. BROWN, Chief Judge, and WISDOM and RONEY, Circuit Judges.

WISDOM, Circuit Judge:

In storm and fury "Betsy's" winds and resulting high waters wrought destruction upon the plaintiffs' property and that of many others living in 1965 in Louisiana near the Gulf of Mexico.

These three consolidated cases present the single question whether the immunity clause contained in § 3 of the federal Flood Control Act of 1928, 33 U.S.C. § 702c, applies to these actions under the Federal Tort Claims Act, 28 U.S.C. §

2671 et seq., for floodwater damage allegedly caused by the negligence of the United States in the construction of the Mississippi River—Gulf Outlet, a navigation project that provided a short-cut from the Gulf of Mexico to New Orleans. We conclude that § 3 does not bar these suits and affirm the judgment of the district court denying the Government's motion to dismiss. In doing so we rely heavily upon the anaylses and well documented opinions of District Judges Herbert C. Christenberry and Frederick J. R. Heebe.

## I.

The Mississippi River—Gulf Outlet is a deep water channel constructed by the Corps of Engineers in the late 1950's and early 1960's at an estimated cost of $88,-000,000. The channel is approximately 66 miles long, including 46 miles of "land cut," and runs from the Gulf of Mexico through the parishes of St. Bernard and Plaquemines to New Orleans. The outlet enables ships from ports east of the Mississippi River to head north for New Orleans at Breton Sound, many miles east of the river mouth, at a saving of sixty miles. Ships thus pass from Breton Sound through the outlet into the Industrial Canal and then into the Mississippi River.

These cases began in September 1965 when Hurricane "Betsy" struck the southeastern Louisiana coast. The plaintiffs are owners of property in Orleans and St. Bernard parishes who suffered damage when hurricane-driven waters overflowed the outlet and flooded their properties. Shortly thereafter the plaintiffs filed these suits against the United States in the United States District Court for the Eastern District of Louisiana. Upon the suggestion of the United States, the district court consolidated the three cases for trial.

The complaints charged that before the construction of the outlet the plaintiffs' properties had been free from hurricane-driven waters, but that as a direct and proximate result of the construction of the outlet the plaintiffs' properties were exposed to the "effects and encroachments of the storm driven waters of Hurricane 'Betsy.'" The plaintiffs alleged that the outlet had been negligently constructed and specifically pleaded the doctrine of res ipsa loquitur. In the alternative, and only in the event that the doctrine of res ipsa loquitur be held inapplicable, the plaintiffs alleged that the Government's negligence consisted of constructing the outlet "without taking appropriate steps to impede and lead off rising hurricane waters before they reached the residential areas of the surrounding country, and without taking the appropriate steps to build retaining levees to protect the residential areas of the surrounding country from flooding due to hurricane driven waters."

The United States moved to dismiss the complaints on several grounds, one of which was that § 3 of the Flood Control Act of 1928, 33 U.S.C. § 702c, barred suits against the United States for damages resulting from floods or flood waters.[1] The district court denied the motion. With respect to the § 3 ground, Judge Christenberry held that the Mississippi River—Gulf Outlet was not a flood control project but a navigation aid project and that § 3 did not bar suits against the United States for floodwater damage resulting from the Government's negligence unconnected with flood control projects. The United States conceded that the outlet was a navigation aid project but argued that in any case § 3 afforded it immunity. On that ground the United States moved for a rehearing on the motion to dismiss.[2]

1. The other grounds alleged in support of the motions were (1) the complaints fail to state a claim against the United States upon which relief can be granted; (2) the complaints were not filed within the time period prescribed by statute; and (3) the acts complained of fall within the "discretionary function" exception of 28 U.S.C. § 2680.

2. The United States did not ask the court to reconsider its decisions on the other grounds urged in support of the motion to dismiss. See 301 F.Supp. at 948 & n. 2.

Later the docket in the Eastern District of Louisiana was reorganized and these cases were assigned to Judge Heebe. In June 1969 Judge Heebe wrote an opinion thoroughly discussing the Government's § 3 contention. Concluding that Judge Christenberry had correctly denied the motion to dismiss, Judge Heebe denied the motion for a rehearing. *See* Graci v. United States, E.D.La.1969, 301 F.Supp. 947. This Court granted the Government leave to take an interlocutory appeal from that order.[3] *See* 28 U.S.C. § 1292(b).

## II.

On appeal the United States contends that § 3 of the Flood Control Act of 1928, 33 U.S.C. § 702c, affords the Government an absolute immunity from liability for floodwater damage regardless whether the negligence alleged was in connection with a flood control project or a navigation aid project. The United States argues also that the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq., did not in any way repeal the immunity that § 3 grants.

In pertinent part § 3 reads as follows:

No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place . . .

33 U.S.C. § 702c.[4] The legislative history of § 3 is singularly unrevealing. The immunity provision was not introduced into the flood control bill until shortly before the final version of the bill was enacted into law. The provision was then adopted with little or no discussion. The only comment concerning the provision that the district court could find was that of a House member "to the effect that in engaging itself in flood control works, the government should not lay itself open to suits for flood damage." 301 F.Supp. at 953 n. 8. Our independent review of the legislative history, with the aid of the parties, has uncovered nothing more illuminating. We can ascribe no special significance to the fact that the flood control bill also included appropriations for channel stabilization and navigation improvement. The thrust of the measure was flood control, and it was in that context that § 3 was enacted. Both parties attempt to read meaning in the Title and Chapter headings of the United States Code volume in which § 3 can now be found. That approach seems to us, as it did to Judge Heebe, at least in this case, to be speculative and unenlightening. *See* 301 F. Supp. at 953–954.

The leading case on the construction of § 3 is the Eighth Circuit's decision in National Manufacturing Co. v. United States, 8 Cir. 1954, 210 F.2d 263. As Judge Heebe observed, the *National Manufacturing* case was the first case to uphold the vitality of the § 3 immunity in the face of the broad waiver provisions of the Federal Tort Claims Act. 301 F.Supp. at 951. In that case several

3. The Court also granted two other parties leave to file an amicus curiae brief on behalf of the appellees. Those parties were also property owners who had suffered floodwater damage during the course of Hurricane "Betsy". In fact, their complaints filed in the United States District Court for the Eastern District of Louisiana have been consolidated for trial with those of the plaintiffs-appellees in this appeal.

4. The remainder of that sentence reads as follows:
*Provided, however,* That if in carrying out the purposes of * * * this Act it shall be found that upon any stretch of the banks of the Mississippi River it is impracticable to construct levees, either because such construction is not economically justified or because such construction would unreasonably restrict the flood channel, and lands in such stretch of the river are subjected to overflow and damage which are not now overflowed or damaged by reason of the construction of levees on the opposite banks of the river, it shall be the duty of the Secretary of the Army and the Chief of Engineers to institute proceedings on behalf of the United States Government to acquire either the absolute ownership of the lands subjected to overflow and damage or floodage rights over such lands.

owners of property situated along the Kansas River brought suit against the United States under the Federal Tort Claims Act to recover for the floodwater damage suffered by them in the course of a July 1951 flood. The Kansas River had long been subject to floods, and the United States has constructed flood control dams, levees, dikes, and other works along the river in an attempt to prevent or minimize the danger of flooding. As an incident to the flood control program several government agencies, including the Corps of Engineers, the Geological Survey Section of the Department of the Interior, and River Forecasters of the Weather Bureau, regularly gathered information concerning the rise and fall of the waters of the river and its tributaries and the rainfall in the area and disseminated reports to the populace along the river. The property owners' complaint charged that in July 1951 the United States, knowing that the river was in danger of flooding, negligently assured the plaintiffs that the river would not overflow its banks and negligently failed to warn the plaintiffs of the impending overflow in time for them to provide for the safety of their property. The district court granted the Government's motion to dismiss on the ground, inter alia, that § 3 barred recovery against the United States for floodwater damage.[5]

The Court of Appeals for the Eighth Circuit, affirming the judgment of the district court, articulated the rationale of § 3:

> when Congress entered upon flood control on the great scale contemplated by the Acts [of 1928 and 1936] it safeguarded the United States against liability of any kind for damage from or by floods or flood waters in the broadest and most emphatic language. The cost of the flood control works itself would inevitably be very great and Congress plainly manifested its will that those costs should not have the flood damages that will inevitably recur added to them. Undoubtedly floods which have traditionally been deemed "Acts of God" wreak the greatest property destruction of all natural catastrophies and where floods occur after flood control work has been done and relied on the damages are vastly increased. But there is no question of the power and right of Congress to keep the government entirely free from liability when floods occur, notwithstanding the great government works undertaken to minimize them.

> .    .    .    .    .    .

> So that uniformly and throughout the country at any place where there is damage "from" or "by" a flood or flood waters in spite of and notwithstanding federal flood control works no liability of any kind may attach to or rest upon the United States therefor.

210 F.2d at 270, 271.

The Court further concluded that the Federal Tort Claims Act did not repeal § 3: The Act contains a list of the statutes that are repealed; the list does not include § 3. See 60 Stat. 842, 846–847. Responding to the plaintiffs' contention that there had been a repeal by implication, the Court said,

> when consideration is given to the basic importance of Section 3 to the vast federal flood control appropriation and undertakings, it should not be lightly assumed that the fundamental policy was reversed by mere implication with nothing said about it. "It is a cardinal principle of construction that repeals by implication are not favored." United States v. Borden

---

5. The court also granted the Government's motion to dismiss on the grounds (1) that the Federal Tort Claims Act did not authorize the plaintiffs' action; (2) the plaintiffs' claims were based on alleged negligent misrepresentation and were therefore barred by the exception in 28 U.S.C. § 2680(h); and (3) the plaintiffs' claims were based on the failure of Government employees to perform a "discretionary function" and were therefore barred by the exception in 28 U.S.C. § 2680(a). See 210 F.2d at 274–279.

Co., 308 U.S. 188, 198, 60 S.Ct. 182, 188, 84 L.Ed. 181.

210 F.2d at 274.

The Eighth Circuit's construction of § 3 and its relationship to the Federal Tort Claims Act has been followed in other suits for floodwater damage based on "false assurance". For example, in Clark v. United States, 9 Cir. 1954, 218 F.2d 446, the Ninth Circuit affirmed a judgment for the United States partly on the ground that § 3 barred the plaintiffs' action.[6] With respect to that ground the court said,

> As to the liability of the United States because of the alleged negligence of the Engineers, we think a provision of 33 U.S.C.A. § 702c bars recovery. . . . We find no merit in appellants' contention that the Tort Claims Act repealed this provision by implication. The provision of 33 U.S.C.A. § 702c barring liability "from or by floods or flood waters" expresses a policy that any federal aid to the local authorities in charge of flood control shall be conditioned upon federal non-liability. To base recovery here on any act or omission of the Engineers in assisting in the fight against this flood would run counter to the policy this expressed. See National Mfg. Co. v. United States, 8 Cir. 1954, 210 F.2d 263, 270–275, certiorari denied, 347 U.S. 967, 74 S.Ct. 778, 98 L.Ed. 1108.

218 F.2d at 451–452. *See also* Peerless Serum Co. v. United States, W.D.Mo. 1953, 114 F.Supp. 662.

Since the *National Manufacturing* and *Clark* decisions, several courts have extended the § 3 immunity to bar suits against the United States on the theory that a flood control project had been negligently designed, constructed, operated, or maintained. In Stover v. United States, 9 Cir. 1964, 332 F.2d 204, the Ninth Circuit itself said,

> We hold that 33 U.S.C. § 702c is an immunity statute covering even ordinary negligent construction or maintenance of flood works and that to hold otherwise would be a repudiation of our Clark case. . . . Also, the leading case, National Manufacturing Co. v. United States, 8 Cir., 210 F.2d 263, holds § 702c to be an immunity statute. And, it is a well reasoned case. We affirm on the ground, negligence or no negligence, § 702c precludes recovery.

332 F.2d at 206. *See also* McClaskey v. United States, 9 Cir. 1967, 386 F.2d 807, 808; Parks v. United States, 2 Cir. 1966, 370 F.2d 92, 93; B. Amusement Co. v. United States, 1960, 180 F.Supp. 386, 389–390, 148 Ct.Cl. 337; Villarreal v. United States, S.D.Tex.1959, 177 F.Supp. 879, 880.

■ These cases, and what little legislative history there is, strongly support the view that the purpose of § 3 was to place a limit on the amount of money that Congress would spend in connection with flood control programs. Congress undoubtedly realized that the cost of extensive flood control projects would be great and determined that those costs should not have added to them the floodwater damages that might occur in spite of federal flood control efforts. See National Manufacturing Co. v. United States, *supra*; Guy F. Atkinson Co. v. Merritt, Chapman & Scott Corp., N.D.Cal.1954, 126 F.Supp. 406, 408.[7] As Judge Heebe

---

6. The court also sustained the district court's finding that the Government had not been negligent. *See* 218 F.2d at 451.

7. The court in *Atkinson* concluded that the purpose of § 3 was to prevent the Government from being held liable for the staggering amount of damages caused by natural floods, merely because the Government had embarked upon a vast program of flood control in an effort to alleviate the effect of the floods. Because Floods could not be eliminated in a single year, flood damage was bound to recur, and Congress did not want to burden its efforts to lessen the total effect of the floods with the cost of the damage that was certain to result in spite of its efforts.
*See also* Valley Cattle Co. v. United States, D. Hawaii 1966, 258 F.Supp. 12, 16.

expressed it, the "immunity from liability for floodwater damage arising in connection with flood control works was the condition upon which the government decided to enter into the area of nationwide flood control programs." 301 F. Supp. at 952. *See also* Clark v. United States, *supra.*

■ The question then becomes whether it is reasonable to suppose that in exchange for its entry into flood control projects the United States demanded complete immunity from liability for the negligent and wrongful acts of its employees *unconnected with flood control projects*. Judge Heebe answered that it would not be reasonable so to conclude. 301 F.Supp. at 952. Our analysis of another group of § 3 cases leads us to agree.

In Peterson v. United States, 9 Cir. 1966, 367 F.2d 271, the plaintiffs brought suit against the United States under the Federal Tort Claims Act to recover for damages incurred when, without a warning of any kind to anyone, a group of engineers attached to the Ladd Air Force Base at Fairbanks, Alaska, dynamited an ice-jam that had accumulated from natural causes in a bend of the Chena River. The ice-jam was causing the river to overflow its banks and flood properties on the Base and in the Fairbanks area. To prevent further damage, the engineers dynamited the ice-jam, which had the effect of discharging a large accumulation of ice and water downstream. The rushing ice and water severely damaged the plaintiffs' property. The district court granted the Government's motion to dismiss on the ground that § 3 was a complete defense to the action. The Ninth Circuit reversed.

The reasoning of the Ninth Circuit is instructive. The Court began by recognizing that Congress intended § 3

to be an integral part of a plan or policy on the part of the Government to embark on a vast construction program to prevent or minimize the incidences of loss occurring from floods and flood waters by the building of dikes, dams, levees, and related works, and to keep the Government entirely free from liability for damages when loss occurs, notwithstanding the works undertaken by the Government to minimize it.

367 F.2d at 275–276. Nevertheless, the court believed that

the District Court, in the situation presented by the record before us, painted with too broad a brush in its conclusion that Section 702c applies to all floods and flood waters which result in whole or in part from unusual or extraordinary climatic conditions. . . In our view the District Court erred in its application of Section 702c to this case.

*Id.* at 276.

The court reviewed the decisions relied on by the United States and the district court—principally National Manufacturing Co. v. United States, *supra*; Stover v. United States, *supra*; and Clark v. United States, *supra*—and concluded that each of them was "clearly distinguishable on the facts" from the instant case. 367 F.2d at 276. The difference between those cases and *Peterson* was that the decision to dynamite the ice-jam—the alleged act of negligence—was "wholly unrelated to any Act of Congress authorizing expenditures of federal funds for flood control, or any act undertaken pursuant to any such authorization." *Id.* at 275.

Later cases reiterated this distinction. In Parks v. United States, 2 Cir. 1966, 370 F.2d 92, the Second Circuit affirmed a judgment of the district court dismissing on § 3 grounds a complaint that the United States had negligently constructed, maintained, and operated a flood control project and thus damaged the plaintiff's property. That result is of course entirely consistent with the *National Manufacturing* and *Stover* cases and indeed with the view we take of § 3 here. The court went on to say, however, that

Peterson v. United States, 367 F.2d 271, 275 (9 Cir. 1966) is distinguish-

able on its facts since in that case flood damage was caused by Air Force personnel pursuant to instructions of engineering officers at the local base and "was wholly unrelated to any Act of Congress authorizing expenditures of federal funds for flood control".

370 F.2d at 92. By drawing that distinction, the Second Circuit seems to have agreed with our review and that of the Ninth Circuit that § 3 is not a bar to claims for floodwater damage caused by the negligence of the Government unconnected with flood control projects.

In McClaskey v. United States, 9 Cir. 1967, 386 F.2d 807, the Ninth Circuit repeated the distinction it drew in *Peterson*. Concluding that § 3 barred a claim for negligent construction of a flood control project, the court cautioned,

It does not follow that the mere happening of a flood insulates the Government from all damage claims flowing from it. In Peterson v. United States, 367 F.2d 271 (9th Cir. 1966), we denied immunity to the Government when its employees dynamited an ice jam in attempting to protect an air force base, causing a release of water that destroyed vessels moored downstream. We read § 702c in its statutory context, noting that it is contained in the Flood Control Act of May 15, 1928, and found that the decision to dynamite the ice jam was "wholly unrelated to any Act of Congress authorizing expenditures of federal funds for flood control, or any act undertaken pursuant to any such authorization." 367 F.2d at 275.

386 F.2d at 808, n. 1.

Indeed, in Valley Cattle Co. v. United States, D.Hawaii 1966, 258 F.Supp. 12, the court allowed recovery against the United States for floodwater damage caused by the Government's negligent maintenance of a stream and culverts. Concluding that § 3 did not bar the action, the court anticipated the reasoning of the Ninth Circuit in *Peterson:*

The stream was straightened and the culverts built, not for any flood control purposes but solely for and as part of the construction of the airfield. The court will take judicial notice that the appropriations for the same did not come out of funds appropriated by Congress for flood control purposes. A reading of the Act and the cases interpreting it all show that the negation of liability of the United States contained in § 702c for flood damage was aimed at flooding occuring in areas involved in actual or potential flood control projects. . . .

258 F.Supp. at 16.

■ Judge Heebe concluded that § 3 should not be construed to be a wholesale immunization of the Government from all liability for floodwater damage unconnected with flood control projects. 301 F.Supp. at 951. Based on our reading of the Act, its scant legislative history, and the *Peterson, Parks, McClaskey,* and *Valley Cattle* cases, we are constrained to agree. In Judge Heebe's words, it is simply impossible

to accept this immunity provision, reasonably related to government involvement in flood control programs, as an absolute insulation from liability for all wrongful acts in other situations, contrary to the express policy of the Federal Tort Claims Act that the government should be held liable for the wrongful acts of its employees in the same respect as private persons.

301 F.Supp. at 954. Thus when, as here, the plaintiffs allege that they have suffered floodwater damage as a result of the negligence of the United States unconnected with any flood control project, § 3 of the Flood Control Act of 1928 does not bar an action against the United States under the Federal Tort Claims Act.

Since we have concluded that the immunity clause of § 3 is not applicable to the facts to this case, we need not reach

**28**

the question whether the Federal Tort Claims Act effectively repealed that section.

■ In the district court the United States also argued that, independent of § 3, a line of cases originating with Bedford v. United States, 1904, 192 U.S. 217, 238, 24 S.Ct. 238, 48 L.Ed. 414, established a rule of absolute nonliability of the Government for flood damage. Judge Heebe thoroughly analyzed those cases and concluded that they did not establish an absolute prohibition of all suits against the United States for floodwater damage. Furthermore, whatever hints of absolute non-liability those cases may have contained, they have now been superseded by the more liberal policy of the Federal Tort Claims Act. *See* 301 F. Supp. at 954–955. It would serve no useful purpose to repeat that analysis here. It is sufficient for us to say that we agree with Judge Heebe that *Bedford* and its progeny do not as a matter of law bar the plaintiffs' suits against the United States under the Federal Tort Claims Act.

■ We call attention to the final paragraphs of Judge Heebe's opinion. There he pointed out that despite his refusal to dismiss the action, the plaintiffs bear a heavy burden in proving that the United States was negligent in the construction of the Mississippi River— Gulf Outlet and that such negligence was the cause of their injuries. 301 F. Supp. at 956. We go along with this note of caution. In starting the plaintiffs on the journey of proving that the Government's negligence was the cause of their injuries from a hurricane such as "Betsy", we feel compelled to say that the plaintiffs are a long way from home.

Therefore, the judgment of the district court is affirmed and the case is remanded for further proceedings.