Charlotte JAMES, Plaintiff-Appellant,

v.

UNITED STATES of America,
Defendant-Appellee.

Kathy BUTLER, Individually and as
Surviving Wife and Heir of Eddy
Butler, Plaintiff-Appellant,

v.

UNITED STATES of America,
Defendant-Appellee.

Susan B. CLARDY, Individually and as
Natural Tutrix of the Minors, Bridget
Marie Clardy and Kenneth Clardy,
Plaintiff-Appellant,

v.

UNITED STATES of America,
Defendant-Appellee.

Nos. 83–2276, 83–4522.

United States Court of Appeals,
Fifth Circuit.

Sept. 4, 1984.

Opinion on Granting Rehearing
En Banc Oct. 17, 1984.

Sharp, Ward, Price & Hightower, T. John Ward, Richard F. Hightower, Longview, Tex., Old & Old, Mount Pleasant, Tex., for James and Butler.

Robert J. Wortham, U.S. Atty., Beaumont, Tex., William J. Cornelius, Jr., Asst. U.S. Atty., Tyler, Tex., Joseph S. Cage, Jr., U.S. Atty., Shreveport, La., Rosemary Denson and Thomas L. Jones, Torts Branch, Civ. Div., Dept. of Justice, Washington, D.C., for the U.S.

D'Amico, Curet & Dampf, Sam J. D'Amico, Baton Rouge, La., for Clardy.

Before GOLDBERG, RUBIN and REAVLEY, Circuit Judges.

REAVLEY, Circuit Judge:

These cases present the question whether Section 3 of the Flood Control Act of 1928, 33 U.S.C. § 702c (1976), gives the

United States absolute immunity for its negligence in the operation of flood control projects. Following the analysis of prior cases, we are obliged to answer in the affirmative, but we take this opportunity to express the opinion that the legislative history analysis previously followed is erroneous and has led to an application of this provision not intended by its framers.

## I.  STATEMENT OF THE CASE

### A.  James v. United States

On June 8, 1979, Charlotte James and Kathy Butler were skiing near the dam structure at Millwood Reservoir in Arkansas.  The United States Corps of Engineers was discharging water from the dam at a high rate, creating a strong current.  The skiers fell near the dam and were pulled by the current through the tainter gates. Eddy Butler dived into the water to assist his wife, Kathy, and was also pulled through the structure.  He drowned, and his wife and Charlotte James sustained physical injuries.

No signs warned of the danger of the current.  A cable with a string of orange buoys attached to it, which usually delineated the area of danger, had broken and drifted when struck by floating debris. Only one of five white anchor buoys was in the vicinity of the danger area.  Government personnel knew that these warning devices were not in place but did not attempt to repair them because of the dangerous current.  They took no other steps to warn the public of the danger.

After a bench trial the district judge found that the plaintiffs were not negligent, that the agents of the United States willfully and maliciously failed to warn of a known danger, and that this failure was a proximate cause of the plaintiffs' injuries. The judge set the damages at $1,000,000 to Kathy Butler for her injuries and the wrongful death of her husband, and $40,-000 to Charlotte James for her personal injuries.  He concluded, however, that section 702c of the Flood Control Act barred plaintiffs' recovery since the injuries result-ed from flood waters related to a flood control project.

### B.  Clardy v. United States

On May 17, 1980, Kenneth Clardy and his father Joseph Clardy were fishing along Bayou Courtableau, a United States flood control project designed to direct excess floodwaters from Bayou Courtableau Basin through the West Atchafalaya Basin protection levee in Louisiana.  The gates of the structure were opened to the maximum capacity, creating a strong current.  The Clardy's boat became disabled and drifted into the inlet channel.  As it was drawn through the open gates of the spillway, the boat overturned and threw Kenneth Clardy into the approach basin.  He drowned while being pulled through the 220 foot long south barrel of the drainage structure.

Only two faded signs at the entrance of the drainage structure warned of the dangerous current.  By the time the signs could be seen, boaters were already in the current.  The district judge entered summary judgment for the United States, holding that 33 U.S.C. § 702c immunized it from liability for negligence related to the operation of a flood control project.

## II.  CURRENT INTERPRETATION OF THE FLOOD CONTROL ACT

The recurrence of floods in the alluvial Mississippi River Valley prompted the United States, in partnership with the states and local governments, to build a network of levees in 1883 along 950 miles of the river banks from Cape Girardeau, Missouri to the Gulf of Mexico.  *United States v. Sponenbarger*, 308 U.S. 256, 261, 60 S.Ct. 225, 226–227, 84 L.Ed. 230 (1939).  This network of flood control projects, known as the Eads Plan, proved inadequate when a flood of disastrous proportions occurred in 1927.  *Id.*  Congress responded by passing the Mississippi Flood Control Act of 1928, authorizing $300,000,000 for flood control projects designed to prevent future disasters.  *See National Manufacturing Co. v. United States*, 210 F.2d 263, 270 (8th Cir.), *cert. denied*, 347 U.S. 967, 74 S.Ct. 778, 98

L.Ed. 1108 (1954). The Act provided in the second paragraph of section 3 (33 U.S.C. § 702c):

No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place: *Provided, however,* that if in carrying out the purposes of sections 702a, 702b to 702d, 702e to 702g, 702h to 702j, 702k, 702l and 702m of this title it shall be found that upon any stretch of the banks of the Mississippi River it is impracticable to construct levees, either because such construction is not economically justified or because such construction would unreasonably restrict the flood channel, and lands in such stretch of the river are subjected to overflow and damage which are not overflowed or damaged by reason of the construction of levees on the opposite banks of the river it shall be the duty of the Secretary of the Army and the Chief of Engineers to institute proceedings on behalf of the United States Government to acquire either the absolute ownership of the lands so subjected to overflow and damage or floodage rights over such lands.

This provision has been applied to flood control projects other than those on the Mississippi River.[1] 33 U.S.C. § 701e (1976); *e.g., Lenoir v. Porters Creek Watershed District,* 586 F.2d 1081, 1086 n. 4 (6th Cir. 1978); *Callaway v. United States,* 568 F.2d 684, 686 (10th Cir.1978); *Clark v. United States,* 218 F.2d 446, 452 (9th Cir. 1954); *National Manufacturing Co.,* 210 F.2d at 274. In interpreting the provision, most courts have cited only the general disclaimer portion stating that no liability shall attach for any flood damage at any place. *See, e.g., Burlison v. United States,* 627 F.2d 119, 121 (8th Cir.1980), *cert. denied,* 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 225 (1981); *Lunsford v. United States,* 570 F.2d 221, 227 (8th Cir.1977); *Stover v. United States,* 332 F.2d 204, 205

n. 1 (9th Cir.), *cert. denied,* 379 U.S. 922, 85 S.Ct. 276, 13 L.Ed.2d 335 (1964); *National Manufacturing Co.,* 210 F.2d at 270. By reviewing only this portion of the section, the courts have construed it to grant immunity in the "broadest and most emphatic language." *National Manufacturing Co.,* 210 F.2d at 270; *see also Morici Corp. v. United States,* 681 F.2d 645, 647 (9th Cir. 1982); *Florida East Coast Railway v. United States,* 519 F.2d 1184, 1192 (5th Cir.1975); *McClaskey v. United States,* 386 F.2d 807, 808 (9th Cir.1967).

In *National Manufacturing Co.,* the first case to deal extensively with section 3, the court interpreted the section to provide absolute immunity to the government for any negligence related to floods or flooding. 210 F.2d at 271. There, owners of property along the Kansas River sued the United States for failing to warn of a flood which damaged their property. The Eighth Circuit stated:

Section 3 plainly bars recovery against the United States. The section does not limit the bar against such recovery to cases where floods or flood waters are the sole cause of damages. It does bar liability of any kind from damages "by" floods or flood waters but it goes further and in addition it bars liability for damages that result (even directly) "from" floods. The use of the word "from" in addition to "by" makes it clear that the bar against federal liability for damages is made to apply wherever floods or flood waters have been substantial and material factors in destroying or damaging property. The language used shows Congressional anticipation that it will be claimed after the happening of floods that negligence of government employees was a proximate cause of damages where floods or floodwaters have destroyed or damaged goods. But the section prohibits government liability of "any kind" and at "any place." So that

---

1. At the time of the original flood control bill and in the 1928 Act, the only flood control projects authorized by Congress were on the Mississippi River and the Sacramento River. The prior flood control act and the 1928 Act

applied to both projects. H.R.Rep. No. 1100, 70th Cong., 1st Sess. 1, 9 (1928). The title of the Mississippi Flood Control Act is therefore a misnomer.

uniformly and throughout the country at any place where there is damage "from" or "by" a flood or flood waters in spite of and notwithstanding federal flood control works no liability of any kind may attach to or rest upon the United States therefor.

The complaint in that case was not directed at government employees engaged in flood control construction, but was confined to flood forecasters. *Id.* at 275. Consequently the holding need not have relied upon section 702c which deals solely with liability for construction of flood control projects. It was, in fact, justified in part on grounds of public policy rather than on a legislative grant of immunity. *Id.* at 274. Nonetheless, *National Manufacturing* absolved the United States of all liability from any damage resulting from floods on the basis of section 702c.

■ This court has declined to construe section 702c as a wholesale immunization provision. If the flooding is unconnected with flood control projects, the United States may be subject to liability. *Graci v. United States,* 456 F.2d 20, 27 (5th Cir. 1971). Thus, where the government's construction of a navigation project diverted flood water to plaintiff's property, its actions did not come within the section 702c's grant of immunity. *Id.; Seaboard Coast Line Railroad Co. v. United States,* 473 F.2d 714 (5th Cir.1973) (no immunity for flooding of plaintiff's property caused by construction of drainage ditch at aircraft maintenance center). Similarly, the Ninth Circuit has held 702c not to bar liability where the governmental action was wholly unrelated to any act of Congress authorizing expenditures of federal funds for flood control. *See Peterson v. United States,* 367 F.2d 271, 276 (9th Cir.1966) (no immunity for dynamiting ice jam which resulted in flooding of properties downstream).

■ If the government's negligence is related to a flood control project, the immu-

nity of the government appears to be absolute. In *Florida East Cost Railway Co. v. United States,* 519 F.2d 1184 (5th Cir.1975), the United States had built levees and other structures that altered the natural drainage of an area, causing washouts. The United States knew of this problem but took no steps to correct it or to notify the railroad of the danger. The soil around a railroad culvert eroded, causing the derailment of a Florida East Coast train. This court held that the United States was insulated from liability under section 702c even when its own negligence caused or aggravated the losses. *Id.* at 1191.[2]

The Fourth Circuit has held that the government may not enjoy immunity if the negligent action was unrelated to the project's operation for flood control purposes; if the action pertained to recreational purposes rather than flood control purposes, the absolute bar of section 702c may be avoided. *Hayes v. United States,* 585 F.2d 701, 702–703 (4th Cir.1978). This reasoning was rejected by the Ninth Circuit in *Morici Corp. v. United States,* 681 F.2d at 648, where it stated that the purpose of the project, rather than the purpose of the employee's conduct, determines the government's immunity under section 702c. This circuit has adopted the Ninth Circuit's view that the *project* must be wholly unrelated to any act of Congress authorizing expenditures of federal funds for flood control. *Florida East Coast Railway Co.,* 519 F.2d at 1191. Even when the United States failed to warn the railway company of the danger of a washout, this negligent action, unrelated to the construction of the flood control project, was held to be within the immunity of section 702c. *Id.*

### III. OUR PLAINTIFFS UNDER CURRENT LAW

■ The cases on appeal are ruled by the inquiry of whether the government's

---

**2.** It has become the accepted rule that section 702c immunity extends to artificially created floods as well as to government actions which may aggravate the damages in natural floods. *See Aetna Ins. Co. v. United States,* 628 F.2d 1201, 1204 (9th Cir.1980), *cert. denied,* 450 U.S. 1025, 101 S.Ct. 1732, 68 L.Ed.2d 220 (1981); *Burlison v. United States,* 627 F.2d 119, 121 (8th Cir.1980), *cert. denied,* 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 225 (1981); *Callaway v. United States,* 568 F.2d 684, 686 (10th Cir.1978).

negligent action was related to a federal flood control project. If so, under the controlling precedent, 702c bars liability. Both dam projects in these cases were constructed and operated at least in part for flood control purposes. Even if the project were designed for flood control but operated at the time of the negligence for another purpose such as recreation, the operation that caused the damage would not be "wholly unrelated" to a congressionally authorized flood control project. *Morici Corp.*, 681 F.2d at 648. Plaintiffs have a difficult burden to meet in showing that their injuries had no relation to a flood control project. Indeed, it is insurmountable.

Section 702c provides that "no liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters ...." Appellants argue that immunity may not be invoked under this section because the damages were not caused by floods or flood waters. Clardy, for example, contends that a fact question exists as to whether the waters in Bayou Courtableau were at flood stage, and therefore she deserves the opportunity to prove that the wrongful death was unrelated to flood waters. Liability of the United States for damages due to operation of a flood control project, however, does not depend upon a change in the stage or source of the water in which a plaintiff is immersed. The government enjoys the same immunity whether the water be a giant surge from melting snow and cloudburst or a placid lake on a summer day.[3]

We recognize the harshness as well as the inconsistencies that may result from the controlling precedent of absolute immunity. If, for example, the Corps of Engineers in charge of a flood control project sends out a boat to replace the buoys warning skiers of the water current and, in the process, runs over a swimmer, the government may have immunity. If a fisherman on that dam is run over by a negligent government employee whose federal work is unrelated to the flood control project, the fisherman may recover.

## IV. BACK TO THE SOURCE

Against this floodtide of authority, and despite the sometimes-heard argument that Congress has signaled its agreement with the statutory construction by leaving the statute unchanged, we believe the effect given section 702c is unwarranted. The United States has sovereign immunity and cannot be sued except when Congress has so provided. *Ickes v. Fox*, 300 U.S. 82, 96, 57 S.Ct. 412, 417, 81 L.Ed. 525 (1937). The Federal Tort Claims Act of August 2, 1946, had not been passed in 1928 or 1936 when section 702c was enacted and amended, and the United States therefore had no liability for damages in tort from floods created or aggravated by the construction of public works for flood control purposes, except with regard to a taking of private property for public uses. *See Jackson v. United States*, 230 U.S. 1, 22, 33 S.Ct. 1011, 1019, 57 L.Ed. 1363 (1913); *Bedford v. United*

---

**3.** Even if our rule limited immunity of the government to cases in which the damage itself is caused by "floods and flood waters," it would be of no help to the Clardy's; waters so described include man-made flow in normal channels. *Id; Aetna Ins. Co. v. United States*, 628 F.2d 1201, 1204 (9th Cir.1980); *Burlison v. United States*, 627 F.2d 119, 121 (8th Cir.1980).

The United States filed an affidavit stating that the flood gates of the Courtableau Drainage Structure were open to alleviate flood conditions. Clardy failed to file a controverting affidavit or other competent evidence challenging this affidavit. Under any view of the law as presently declared, she failed to show that a genuine issue of material fact existed. Fed.R. Civ.P. 56(c), (e); *United States v. An Article of Drug*, 725 F.2d 976, 984–85 (5th Cir.1984).

We likewise reject James' and Butler's contention that because the waters were in their channels, as opposed to overflowing their banks, they were not flood waters. The waters that swept Eddy Butler to his death and injured Kathy Butler and Charlotte James were release waters from the reservoir. The record shows that the release was required because the lake was at flood stage. Witnesses referred to the waters as "flood waters." Whether waters are retained behind a dam, break through a dam, or are released through a dam, they are flood waters for purposes of section 702c, so long as they relate to a flood control project. *See Florida East Coast Ry. Co.*, 519 F.2d at 1192; *Graci v. United States*, 456 F.2d at 26.

*States*, 192 U.S. 217, 224, 24 S.Ct. 238, 240, 48 L.Ed. 414 (1904). Why, then, would a 1928 act include a waiver of liability for damages from flood control projects at a time when the government's absolute immunity was unquestioned? [4]

In 1883, the United States, in cooperation with the state and local governments, constructed a network of flood control projects to alleviate or prevent flooding on the Mississippi River. *United States v. Sponenbarger*, 308 U.S. 256, 261, 60 S.Ct. 225, 227, 84 L.Ed. 230 (1939). The Mississippi River Commission instigated, planned, and executed the project, following a policy of building "levees only" and of closing every outlet on the river, save one. H.R.Rep. No. 1072, 70th Cong., 1st Sess. 1, 5 (1928). The federal government contributed $71,000,-000 to the completion of the Commission

plan; the state and local governments contributed $170,000,000. *Id.* Total local contributions for flood control projects in this region reached $292,000,000. S.Rep. No. 619, 70th Cong., 1st Sess. 1, 3 (1928).

In 1927 a disastrous flood claimed 200 lives, left 700,000 temporarily homeless, and caused property damage in excess of $200,000,000. *Id.* The "levee only" policy was described as the "monumental blunder of the age" and the Mississippi River Commission was discredited. H.R.Rep. 1072, 70th Cong. 1st Sess. 1, 7 (1928). Congress moved quickly to establish a new flood control plan. It asked the Mississippi River Commission and the Secretary of War each to submit a plan. The plan submitted for the Secretary of War by the Chief of Engineers (the Jadwin Plan), would have

**4.** Several courts have considered this question. The Eighth Circuit, the first to address this question, stated in *National Mfg. Co.:*

> It was not indicated in the 1928 Act that Congress expected to carry on the federal flood control projects without imposing upon the United States certain obligations to affected owners of property. The constitutional prohibition against the taking of private property for public use without just compensation was kept in view, *U.S. v. Sponenbarger,* 308 U.S. 256, 60 S.Ct. 225, 84 L.Ed. 230, and provision for compensation to be paid to landowners in certain circumstances is contained in the same section 3 which prohibits any federal liability for damage from or by floods or flood waters. The Federal Tort Claims Act of August 2, 1946, had not been passed in 1928 or 1936 and the government then had a certain sovereign immunity from suit for torts but when Section 3 is read in its context it is clear Congress meant by it that damages from or by floods or flood waters should not afford any basis of liability against the United States regardless of whether the sovereign immunity was availed of or not. The declaration of Section 3 negates the existence of a cause of action against the United States in the situation covered by it.

210 F.2d at 270–271 (footnote omitted). The Ninth Circuit concluded in *Peterson,* 367 F.2d at 275:

> When Section 702c was enacted in 1928, and reenacted in 1936, the Federal Tort Claims Act had not been enacted, and the United States, broadly speaking, possessed sovereign immunity from actions sounding in tort. Hence, it cannot be asserted that Congress intended Section 702c to be but a declaration of exist-

ing law. Rather, it is clear that Congress intended by the enactment of Section 702c in the Act of May 15, 1928, and in similar subsequent flood control Acts to be an integral part of a plan or policy on the part of the Government to embark on a vast construction program to prevent or minimize the incidences of loss occurring from floods and flood waters by the building of dikes, dams, levees, and related works, and to keep the Government entirely free from liability for damages when loss occurs, notwithstanding the works undertaken by the Government to minimize it.

In *Aetna Ins. Co.,* the court said:

> Plaintiffs also argue that since at the time the immunity statute was passed, some twenty years before the Federal Tort Claims Act, there was no governmental liability for negligence, the immunity statute could not have been intended to provide immunity for negligent conduct in connection with flooding. An equally compelling argument can be made, however, that given the existing broad language of the immunity provision, Congress in passing the Federal Tort Claims Act should have manifested an intent to include flood damage arising out of negligence within the scope of the Federal Tort Claims Act. The legislative history is at best equivocal and the matter has been resolved for our purposes by repeated decisions of the Court which have held that 702c bars suits based on negligence. *McClaskey v. United States, supra; Stover v. United States, supra; Clark v. United States, supra.*

628 F.2d at 1205 (footnote omitted). We find these explanations unpersuasive. We do not see section 702c as a restatement of the sovereign immunity principle so well established at the time 702c was enacted.

required local interests to provide all of the rights of way for the flood control projects, thereby enabling the federal government to keep its contribution to the plan at approximately $296,400,000 over ten years.[5] S.Rep. No. 619, 70th Cong. 1st Sess. 1, 11 (1928). The Commission plan would have required the federal government to bear the costs for the acquisition of land as well as for construction at a total of $560,000,-000.[6] *Id.* Congress compromised [7] the two plans, electing to retain the principle of local contribution, but accepting the $292,-000,000 previously expended by local interests on the failed levee system plan as compliance with the contribution requirement. H.R.Rep. No. 1100, 70th Cong., 1st Sess. 1, 3 (1928). Congress authorized the United States to "pay just compensation for all rights of way and *damages,* including expenses to railroads or others in changing their property." *Id.* at 12 (emphasis added). In spite of this, it authorized only $325,000,000 in federal funds for the plan. *Id.* at 13. Section 3 of both the House and Senate versions required that title to the lands be turned over to the states. *Id.* at 5. In a conference committee version, Section 3 was modified, in amendment 14, to state:

> The United States shall provide flowage rights for additional destructive flood waters that will pass by reason of diversions from the main channel of the Mississippi River: Provided, that in all cases where the execution of the flood control plan herein adopted results in benefits to property such benefits shall be taken into consideration by way of reducing the amount of compensation to be paid.
> No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place: Provided, however, That if in carrying out the purposes of

this act it shall be found that upon any stretch of the banks of the Mississippi River it is impracticable to construct levees, either because such construction is not economically justified or because such construction would unreasonably restrict the flood channel, and lands in such stretch of the river are subjected to overflow and damage which are not now overflowed or damaged by reason of construction of levees on the opposite banks of the river it shall be the duty of the Secretary of War and the Chief of Engineers to institute proceedings on behalf of the United States Government to acquire either the absolute ownership of the lands so subjected to overflow and damage or floodage rights over such lands.

S.Doc. No. 91, 70th Cong., 1st Sess. 1 (1928) (Conference Report). This was the first mention of the disclaimer of liability for "damages" and, as noted in *Graci v. United States,* 301 F.Supp. 947, 953, n. 8 (E.D.La.1969), the legislative history provides little insight into Congress' intent in enacting it.

We think, however, that section 3 must be read in its entirety to determine Congress' true intent. The legislative history reveals that Congress was concerned with allocating the costs of a major public works program between the federal government and the state and local interests in the wake of a financial, administrative, and engineering debacle. Having assumed greater financial responsibility than initially proposed by effectively waiving state and local contribution, Congress sought in conference to adjust its outlays for construction by excepting from its share the costs of the items considered to be "damages"—acquisition of property for flowage rights, construction of spillways, and destruction of property in conjunction with

---

5. In a message to Congress, President Coolidge stated that it was "axiomatic that states and other local authorities should supply all land and assume all pecuniary responsibility for *damages* that may result from the execution of the project." S.Rep. No. 619, 70th Cong. 1st Sess. at 11 (1928). (emphasis added).

6. The House estimate of the cost of the Commission plan was $625,000,000, including the value of the required rights of way. H.R.Rep. No. 1100, 70th Cong. 1st Sess. 1, 11 (1928).

7. Congress made a number of compromises. It created a board including the Secretary of War, Chief of Engineers and the Chairman of the Mississippi River Commission to work out the differences in the two plans. It then named the Chief of Engineers as supervisor of the projects, but authorized the Commission to do the work. S.Rep. No. 619, 70th Cong. 1st Sess. 1, 9–10 (1928).

the construction of the flood control projects.

■ The juxtaposition of the general disclaimer of liability for damages with the proviso for the acquisition of certain lands for overflow of flood waters where levees could not be constructed suggests their interrelation. We think it clear that Congress intended to disclaim liability for "takings" and not liability for consequential damages. We find support for this reading in the language authorizing the United States to "pay just compensation for all rights of way and *damages*, including expenses to railroads or states in changing their property." H.R.Rep. No. 1100, 70th Cong., 1st Sess. 1, 3 (1928) (emphasis added). Committee testimony further supports this conclusion. Appearing before the Senate Committee on Commerce, H. Generes Dufour, an attorney from New Orleans and a member of the Mayor's Flood Policy Committee in the City of New Orleans, told the Senate Committee:

> Let me remove any misconception as to what is meant by the term "damages." They are not speaking of damages in the sense of those consequential damages that may result from a break of a levee in the future which may overflow some places. It is settled by the jurisprudence of the United States Supreme Court that neither the Federal Government nor the State is responsible for damages resulting from a break in a dam or levee. The damage that is spoken of in the proposal is the damage in the taking. You may not take the right of way on which a railroad is built in the sense that you take the fee, but when you cause that railroad to be moved or reconstructed in order to create a spillway, let us say, you damage the railroad, and it is a damage in the taking; it a damage resulting from

acquisition of necessary property, whether you pay for the property and take the fee or whether you pay damages in the way of flowage right, or whether you destroy a railroad or other property. It is the constitutional protection against the taking of property without just compensation which is involved, and not the consequential damage in the future resulting from the failure of the protective works.

Mississippi River Flood Control Act of 1928: Hearings on S. 3740 Before Senate Committee on Commerce, 70th Cong., 1st Sess., Vol. 1 p. 73 (Jan. 24, 1928).

We believe that only this definition of "damages" explains the placement of the disclaimer in section 3 adjacent to two provisions related to the taking of private property for public purposes. It also explains why the Congress would add the provision at a time when it enjoyed absolute immunity from consequential damages. If our interpretation is correct, the Federal Tort Claims Act, 28 U.S.C. § 2674 (1976), should subject the United States to tort claims for flood control projects "in the same manner and to the same extent as a private individual under like circumstances . . . ." [8]

## V. CONCLUSION

Having espoused our view of the intent of Congress, we are nonetheless bound by the prior decisions of panels of this circuit. Following *Florida East Coast Railway*, 519 F.2d at 1192, and *Graci*, 456 F.2d at 26, we must affirm the district court's decision in *James v. United States* and *Butler v. United States* that Section 702c bars plaintiffs' recovery for injuries. We must likewise affirm entry of summary judgment against the plaintiff in *Clardy v. United States*.

AFFIRMED.

---

**8.** The language of a House Report defining the "boundaries of the sovereign immunity waived" by the Federal Tort Claims Act may be revitalized:

> The first section of section 402 exempts from the bill claims based upon the performance of discretionary functions or duties on the part of a Federal agency or Government employee, whether or not the discretion involved be abused, and claims based upon the act or omission of a Government employee exercising due care in the execution of a statute or regulation, whether or not valid. This is a highly important exception, intended to preclude any possibility that the bill might be construed to authorize suit for damages

> against the Government growing out of an authorized activity such as a flood-control or irrigation project, where no negligence on the part of any Government agent is shown, and the only ground for suit is the contention that the same conduct by a private individual would be tortious, or that the statute or regulation authorizing the project was invalid.

*See Dalehite v. United States*, 346 U.S. 15, 28 n. 21, 73 S.Ct. 956, 964 n. 21, 97 L.Ed. 1427 (1953). *But see Aetna Ins. Co.*, 628 F.2d at 1205 n. 2. This language further suggests that Congress entertained the concept that the United States could be liable for its employees' negligence related to a flood control project.

GOLDBERG, Circuit Judge, specially concurring:

My brother Reavley's opinion makes plain the illogic and injustice of the result that the principle of stare decisis forces upon this Court today. Were I young again and not cast in the status of senior judge, I would seek en banc consideration of this case for the purpose of overruling the precedential impediments to plaintiffs' recovery. I would need no further support than my brother Reavley's historiographically brilliant opinion.

ON PETITION FOR REHEARING AND SUGGESTION FOR REHEARING EN BANC

Before CLARK, Chief Judge, GOLDBERG, GEE, RUBIN, REAVLEY, POLITZ, RANDALL, TATE, JOHNSON, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS and HILL, Circuit Judges.

BY THE COURT:

A member of the Court in active service having requested a poll on the applications for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc,

IT IS ORDERED that this cause shall be reheard by the Court en banc with oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of supplemental briefs.